[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
This case involves the enforcement and modification of a Rhode Island decree of dissolution of marriage brought in Connecticut pursuant to General Statutes § 46b-71 and § 46b-105.[1] The case was heard over four days in December, 2000, and January, 2001. The court heard from the parties: from Ronald D. Anderson, Ph.D., who performed psychological testing on all parties; from Deborah McGeehan Ph.D., and from Walid Jazari, M.D., a psychiatrist for the plaintiff.
The parties include the plaintiff, Donanova now known as Donanova M, her former husband, Timothy F Jr., and the paternal grandparents, Timothy F Sr and Gail F. The aforementioned parties appeared personally and were represented by counsel. There is a minor child of the parties who is the subject of this controversy, Ashley F, born August 1990. Ashley was represented in these proceedings by an attorney to present the child's wishes to the court and to be her personal advocate, as well as, an attorney who acted as her guardian ad litem. This distinction between roles of guardian ad litem and attorney is the approved and preferred practice in Connecticut. Ireland v. Ireland, 246 Conn. 413, 439,717 A.2d 676 (1998); In re Shaquanna M. 61 Conn. App. 592, 607, ___ A.2d ___ (2001). All counsel vigorously and capably represented their clients.
 I BACKGROUND
CT Page 2617
The history of this case comes largely from information self-reported to Dr. Anderson during his psychological evaluation and from his forty-seven page report which was admitted by agreement into evidence, and from transcripts and court documents from Rhode Island and Connecticut. The plaintiff indicates she was the youngest of two children, born in Westerly, Rhode Island, and that her parents were divorced before she was born. She has an older brother. Her mother was from France; she did not speak English, and the family was on welfare until Donanova was in her teens. Donanova believes her mother was unable to work because her father's family used their influence to prevent her from working. She says her father was a New York police officer who did not support the family. She had almost no contact with her father, and when she went to visit her father when she was eighteen years of age, he denied that he was her father and told her not to come back. She reports that she has been sexually abused by two of her doctors: at age eleven, one doctor did something to her; and, as an adult at age twenty-two, an oral surgeon sexually abused her while pulling her teeth. She further reports that she dropped out of high school in the eleventh grade but later obtained a general equivalency diploma.
She began dating an older boy, the defendant, who lived across the street when she was eighteen. They dated for two years and were married when Donanova was six months pregnant with Ashley. The defendant admits to a terrible relationship with Donanova, frequently caused by his own abuse of alcohol and drugs. When Ashley was about six months old he and Donanova had a fight; he threw a wicker basket at her, which apparently hit her and the child. She called the police. He was arrested and left the home. He did keep in contact with the plaintiff and, at one point, they attempted a reconciliation. They took a trip to Canada and upon her return, Donanova called her attorney and threatened to have the child's father arrested for kidnaping her. The defendant packed his bags and fled to Texas. The plaintiff obtained a decree in her favor on October 16, 1991, which was made a final dissolution of marriage on January 21, 1992. The defendant, who was non-appearing, was not granted visitation.
The paternal grandmother, Gail F recalls that she very actively helped care for Ashley during the first six months of her life. After her son and daughter-in-law separated, however, there was no longer any visiting. According to Gail F approximately two years later, the grandparents resumed visitation. Although it is unclear from the file, it appears that during 1994 and 1995, some visitation was occurring in Rhode Island. The visitation was not overnight visitation, and the child's father was permitted supervised visitation in the presence of his parents.
 A
CT Page 2618 A Sexual Abuse Allegation
On February 14, 1995, Donanova called the Child Abuse Hotline to report an allegation of sexual abuse of her daughter by the child's father. Ashley's maternal grandmother was interviewed and said Ashley had watched a program on sexual abuse on television and that Ashley first reported that a little girl at her nursery school touched her vagina, then Ashley said that a little boy had touched her, and later reported that her father had touched her.
The Rhode Island child protection investigator noted that the visits between Ashley and her father had been supervised. Dr. Anderson reported that if the sexual contact had occurred at all it would have happened during a birthday party, at which the paternal grandparents were present and which was supervised by a sheriff who video-taped the entirevisitation.
Donanova told the worker that she did not call the hotline immediately because her daughter had been changing her story. Donanova said that her daughter had first reported that a little girl had put her finger in her vagina when she was at the day care center known as "Little People," located in Westerly. Donanova immediately took the child directly to the day care center. According to the Rhode Island child protection investigator who interviewed a staff person at the day care center, Donanova was "extremely bizarre, strange and weird." Ashley had been enrolled in the center less than a week; Ashley seemed frightened of her mother, and Donanova had complained that she had not wanted to have her daughter in the first place. While at the day care center, Ashley changed her story and said that her father had touched her genital area. A physical examination of Ashley revealed no evidence of trauma to her vagina. The police investigated the complaint, and a grand jury subsequently voted against indicting the father for 1St degree Child Molestation.
Although all allegations of any sexual abuse of children are treated by child protection workers and the courts with the greatest gravity, allegations of sexual abuse of children made by one parent against another parent during custody or visitation disputes are inherently suspicious because the motives for making such a charge may be very suspect. In this case, there have been numerous clinicians who have probed and counseled this child and the various parties. Virtually all of them have found the child's mother to be hostile to the defendant and his parents even pre-dating the allegations of sexual abuse. Judge Suttell in the Rhode Island Family court, who was aware of the allegations and of the findings and involvement of three clinicians, noted on May 24, 1996: CT Page 2619 "We also heard testimony from Miss Prettyman, the family history information obtained by Miss Prettyman was suppled in its entirety by Miss M In the first ten to fifteen minutes with Ashley, the child disclosed her father put his finger in her vagina. Miss Prettyman testified that it's quite unusual for a child to make such a disclosure so quickly and noteworthy that she never said it again over the course of several sessions. Nor did her drawings or other activities suggest any sexual abuse by father. Ashley also stated to Miss Prettyman her grandparents are evil and have physically and mentally abused her. In the voluminous records, there is no evidence to support this contention. . . .Miss Prettyman concludes that Ashley was simply repeating what she heard grownups saying about the Fs. And again, that was the same that Ashley told me when I interviewed her, she stated the purpose of visiting the Fs in New Jersey was essentially so she can be a slave and she would be making beds and washing dishes for the Fs."
When the Rhode Island child protection worker interviewed Donanova and noted to her that the visitation had been supervised by the paternal grandparents and video-taped, Donanova said she did not trust them. In this same regard, Ashley, who has fully adopted her mother's version of the episode, told Dr. Anderson in May of 2000 that she did not ever care to see her father because he "touched" her when she was three or four. Dr. Anderson noted that it was unlikely that she could recall her father touching her: "There is considerable evidence that children below the age of four are unable to produce veridical[2] memories of events. Memories at age four are high susceptible to outside influence. Paradoxically, memories which are not actually based on a recollection of events are often the most strongly held and defended. It seems that Ashley may actually believe that she was sexually abused by her father, whether or not that was actually the case." (Psychological Evaluation, p. 8.) It is clear to this court from all of the testimony that Donanova has consistently and permanently imprinted the notion that Timothy F, Jr. has sexually harmed Ashley upon the mind of this child. Whether true or not, this cannot possibly be beneficial to the child. This court finds the allegation of sexual touching to be very implausible. During the year 2000, in Connecticut, Donanova has recently indicated again that Ashley has been inappropriately touched by a boy at Ashley's elementary school.
 B Rhode Island Litigation
As a result of those allegations, the problems of visitation were further polarized resulting in continued litigation to obtain visitation rights. A Rhode Island Consent Decree filed with this court pursuant to the filing of the Foreign Matrimonial Judgment indicates "[T]his matter CT Page 2620 was heard before this Honorable Court on many and diverse dates commencing with a filing of a Motion to Modify by the Defendant, Timothy F Jr. on or about the 24th of November, 1995." On that same date the parties reached an agreement providing for a Consent Decree.
The Consent Decree provided visitation for the child's father to be supervised by his mother and "all reasonable rights of visitation for Gail E and Timothy F Sr." The visitation was permitted outside of Rhode Island provided it was supervised by Gail F but was not to take place in the state of Alabama where Tim F Jr. lived "for the time being." The overnight out of state visitation called for visitation for five days after Christmas, from December 26 to December 31, 1995 and for three day weekends in February, March and April of 1996. The order provided for a visit coordinated through the office of a Dr. Berman on December 20, 1995, who was only to make it known to the court if there were any serious objections to the visit. None of those court ordered visits ever occurred!
This court has carefully read the transcript of proceedings before the Honorable Paul Suttell of the Washington County Family Court, which occurred on May 1996. (Defendant's Exhibit D.) Donanova M appeared personally and with counsel. The paternal grandparents appeared personally and through counsel. It appears from the transcript that a Doctor Judith Lubiner was to observe visitation between Ashley and the grandparents. It did not take place. In addition to Dr. Lubiner, and Dr. Berman yet another behavioral science professional, Dr. Yardley Prettyman, was involved in the constellation of advisers. Based upon her testimony and the judge's own interview of the child, it was clear to the judge that Ashley's "mind has been greatly poisoned with respect to her relationship with her grandparents." The Rhode Island court found that "Miss M has abused and misused the system, the legal process throughout my involvement with this case and that "Miss M has undermined the spirit, if not the letter of virtually every court order regarding visitation."
"I don't believe Miss M had any intention of complying with that order, not on December 24th when she agreed to it. Not on December 2nd when she saw Doctor Berman and not on December 26th when the Fs traveled to Rhode Island to pick up Ashley. I further believe she was well aware of the order and is in wilful contempt of the orders of this court. This is not the first time that Miss M has disregarded a court order. Throughout my involvement with this case she has consistently disregarded court orders, compromised her own attorneys and generally has abused the legal process. She's demonstrated selective memory, shaded the truth and outright lies on the witness stand. Some of her performances would have been worthy of an academy award if they had not been so transparent. . . .This has been, in my opinion, a blatant violation of a CT Page 2621 court order. The Fs had made plans for a week long visitation in New Jersey. Timothy F, Ashley's father, had made plans to travel from Alabama in order to exercise his rights of supervised visitation. No doubt the lives of many members were disrupted as a result of Miss M's contemptuous conduct. In addition, the Fs have incurred expenses to travel to Rhode Island to pick up Ashley to prosecute this motion to adjudge in contempt. Miss M ought to be held accountable for contemptuous conduct. She is therefore ordered to be incarcerated at the Adult Correctional Institution one day for each day the Fs were denied their court ordered visitation. As stated earlier, the primary purpose of contempt proceedings is to compel compliance with court orders. In this case before the court, the ultimate purpose of the order is so the child can have an opportunity to reestablish a relationship with the paternal side of the family. The court was therefore willing to suspend the incarceration provided that Miss M comply with all court orders. We set up a system since that time whereby Doctor Lubiner was to observe visitation. Miss M did not take the child there. . . ." (Judge Suttell Tr. p. 16.)
The court also found that Donanova sabotaged a plan by one of Rhode Island's psychologists to help repair the relationship between Ashley and her father in a safe and neutral setting. The family court, thereafter, found Donanova to be in willful contempt of court and ordered her to be incarcerated in the Adult Correctional Institute for five days and suspended the incarceration until June 10, 1996, to allow the mother to be with the child during Ashley's tonsillectomy. The judge ordered her to report back to the court on June 10th and to serve until June 14, 1996. Donanova failed to appear in court on June 10, 1996. A body attachment was issued commanding that she be taken into custody. (Defendant's Exhibit B.) Donanova Marie M took her child and left the state of Rhode Island in June 1996, and moved to Connecticut.
 C Connecticut 1996 to date
When Donanova fled the jurisdiction of the Rhode Island court she did not tell the paternal grandparents where she was going or where they could reach her for visitation. Donanova moved with her mother, her brother, and Ashley. Since moving to Connecticut they have lived in the Yantic section of Norwich, then to Jewett City, then to Plainfield and presently they live in Preston. Since moving to Connecticut, Donanova has entered into another failed relationship which has produced a child Joseph, now aged three years and four months old. The location of the father of that child is unknown. It is known that he has a serious problem with gambling. It is likely that the plaintiff met him at the Foxwoods Casino where she works as a card dealer. Donanova has no present CT Page 2622 relationship with the father of that child, Ashley's father or her own father. "None of us have a relationship with our father" Donanova testified. Her older brother, who has lived with Donanova and the extended family has recently moved out of the home.[3]
Donanova testified that she has permitted visitation with the paternal grandparents. She denies sabotaging visitation or denying visitation. The paternal grandparents only located her and their granddaughter in Connecticut by hiring a private investigator. In September, 1999 they brought this present action to obtain visitation rights. The record reveals that the court (Martin, J.) entered an order on November 1999, that the plaintiff was not to remove the child from her present residence in Plainfield, CT. until further order of the court and the 1child was to call the paternal grandparents at 4:00 p.m. on each Sunday. The case was continued to December 1999. On January 2000, the parties entered into a stipulation approved and ordered by the court (Martin, J.) to transfer the case to Windham Judicial District where Donanova resided. The order provided for the psychological evaluation of all parties by Northeast Clinical (Specialists), Dr. Anderson's firm, and provided for certain visitation January 10, 2000 from 5:00 to 7:00 p.m. and Saturday January 15, 2000, from 12:00 to 4:00 p.m.
The case was transferred to Putnam, and on March 2000 the parties again entered a stipulation which provided that the paternal grandparents could have visitation every third Sunday beginning March 18, from 9:00 a.m. to 6:30 p.m. Judge Potter approved the stipulation and entered it as an order of the court.
Without seeking modification of the prior court orders, Donanova moved from Plainfield, CT. to Preston, CT. within the Judicial district of New London on or about February 17, 2000.
On March 28, 2000, the paternal grandparents moved for a finding of contempt for moving in violation of the court's order, for failing to provide visitation and for failing to submit to the psychological evaluation. On April 27, 2000 the grandparents filed a motion to compel Donanova to contact Dr. Anderson for an appointment. More than three months had elapsed since she had agreed to do so.
On May 26, 2000 the plaintiff filed a motion to modify the Rhode Island decree to terminate the grandparent's visitation or to provide for supervised visitation On June 27, 2000, the parties appeared in court and stipulated that Donanova F shall meet with Dr. Anderson on July 23, 2000. The stipulation was approved and the court (Foley, J.) ordered compliance. CT Page 2623
On October 4, 2000, the defendants again moved for a finding of contempt for denial of visitation rights. They were supposed to have visitation every third Sunday beginning March 18, 2000. Gail F testified in December that she and her husband were actually only able to exercise two visits between March and December. The first occurred in April when they met Ashley at the McDonalds in Plainfield, a curious place to meet since Donanova and her family had moved to Preston some two months earlier. The Fs took Ashley to Sunday Mass. at St. Patrick's Cathedral in Norwich, then to lunch and then to Ocean Beach in New London and then back to the Plainfield drop-off at McDonalds. A second visit occurred in May. Again the pick-up was in Plainfield on a Sunday and the took Ashley to St. Patrick's, they watched five christenings which Ashley found entertaining, and later went to a Norwich Navigators baseball game. They returned her to Plainfield. The grandparents did not see her again through the beginning of this trial. Donanova told Dr. Anderson that she let the visits go on until her then nine year old daughter said: "I'm not taking it anymore — I'm not going on these visits."
The Fs have spent considerable amounts of money for attorneys fees, private investigators, travel to courts, to therapists, and have paid for the psychological evaluation which cost $3,800. They have invested a vast amount of time since 1995 and have little more than two visits to show for their five years of effort. The grandparents have not had an overnight visit with their granddaughter since she was an infant in 1991. Numerous clinicians have tried to intervene to reduce the plaintiff's overwhelming anger and hostility. This court finds Donanova has used and manipulated these clinicians, numerous attorneys and the courts of Rhode Island and Connecticut to her own misanthropic ends. To this enormous investment of time, and money, as well as the emotional investment of the paternal grandparents, Donanova Marie M says "I don't think any of us has done our best."
On November 3, 2000, the grandparents moved for an order transferring custody to them, predicated upon the results of the psychological evaluation. Due to the urgency of the situation as expressed in Dr. Anderson's psychological evaluation, and the alleged violation of the orders of visitation, the court took this matter up for hearing on December 5, 2000.
The court heard testimony over three days. The court heard the testimony of Dr. Ronald Anderson, Dr Deborah McGeehan, the parties and a recently engaged psychiatrist, Walid Jazari, the plaintiff's present therapist. Following the testimony of Dr. Jazari the court continued the case until January 12, 2001, to permit the various litigants to meet with Dr. Jazari in a controlled setting, to allow Ashley to meet her father, to allow Ashley to meet with her grandparents in the presence of her CT Page 2624 mother, to attempt to facilitate visitation in a less hostile environment and hopefully to give the parties one last opportunity to reach an agreement among the parties. Some of the objectives were met. The parties were unable to come to a negotiated settlement. The trial resumed on January 12, 2001, and the case concluded all testimony on the same day.
 D The Psychological Evaluation
Dr. Ronald Anderson is a psychologist well known to the court especially for his work with juveniles, with sexually abused children and with sexual offenders. He is President of the Connecticut Association of Treaters for Sexual offenders. He spent approximately five and a half hours with each adult of the four adults and with Ashley; he performed a clinical interview and administered a full battery of psychological tests on each of them. He prepared and submitted a forty-eight page report detailing his findings.
It is fair to say, as framed by the guardian ad litem, that the report concludes that Donanova M has a tremendous emotional attachment to the belief that the grandparents and the child's father are bad people and that she has transferred these emotional beliefs to the child. Further, Dr. Anderson believes that the child is psychologically impoverished, that there is an enmeshment or melding of personalities between the mother and the daughter and unless this situation is rectified, this child will be seriously disturbed. Dr. Anderson opines that even if the child were in therapy, the child would make no progress in the mother's home given her psychological impoverishment and her hostility to the Fs He further believes that if any sexual touching ever did in fact occur, it was very slight and absent the reinforcement of that by the mother, the child would have no present recollection of it.
"Donanova presented as a bitter, resentful 30 year old women. . . ." Donanova was found to be functioning in the "below average" to "Borderline" range of intelligence. Her parenting skills suggested a common sense approach to parenting but "[S]he did not demonstrate a very adequate understanding of using rewards to motivate children to behave responsibly, and it is remarkable that she reported making her daughter feel `terrible' as a way of punishing them for misbehaving" and that this was particularly destructive to Ashley.[4] He views Donanova as suffering a delusional disorder. He viewed her response style so extremely defensive that he could only get a partial picture of her but was able to determine that she had distorted beliefs and negative perceptions. These are harmful to Ashley's reality testing. Donanova transfers these distortions of reality to Ashley who is then unable to CT Page 2625 validate her own perceptions of reality which are critical to Ashley's proper socialization. As a consequence, Ashley dwells on negative perceptions of herself and has feelings of guilt or remorse since she sees that there are many discrepancies between what she knows and what her mother tells her. Dr. Anderson describes this as cognitive dissidence when a person harbors two conflicting beliefs or attitudes. This creates an internal tension and needs to be reconciled. "If these problems are not addressed she is going to be a seriously disturbed child," he said. Notwithstanding all of this, Ashley is closely bonded to her mother and, as earlier indicated, has externally adopted her mother's view of the grandparents as the incarnation of evil. On the other hand, Ashley has had visits with her grandparents without catastrophic problems. The photographs of the visits do not show the child in any distress. It is clear, however, that Ashley could, under no circumstances, allow her mother to believe that she enjoyed a visit.
With respect to the paternal grandparents, Dr. Anderson's evaluation is that these New Jersey residents are high functioning average to above average people who show no indications that they would be unable to provide care and protection for the child. Timothy Sr. is a retired U.S. Navy Lieutenant Commander presently working in a management position. Gail is a registered nurse presently working part-time as a Rehabilitation Nurse/case manager for an insurance firm. They have been married for forty years. Donanova is very threatened by everything the Fs represent. Gail F is aware of that and tends to exploit those feelings of inadequacy whenever she is denied visitation.
The child's natural father is not considered as a placement resource at this time due to the estrangement from his daughter, the lack of geographic proximity in Alabama and his present occupation as a truck driver that keeps him on the road away from the home for three weeks of work followed by five days off. He indicates he stopped using alcohol and drugs nine years ago and has maintained stable employment. He has always emphatically denied sexually inappropriate touching of his daughter.
Dr. Anderson's recommendations are both urgent and extreme. He indicates:
 "1) The evaluation results strongly suggest that Ashley is exposed to ongoing emotional and psychological abuse in her mother's care and that she is presently at high risk for serious emotional problems in adolescence and adulthood. A referral should be made to the Department of Children and Families, to take steps to ensure her welfare. Her present relationship with her mother is very unhealthy, and it would be important that she receive CT Page 2626 counseling, but she is unlikely to benefit from counseling while she is in her present home. At least temporary placement outside the home is strongly recommended. It would be necessary to remove her from her mother's dominant control to understand her current needs.
 "2. If Ashley is not removed from her present home, steps should be taken to see that she is engaged in counseling and that she has regular visitation with her paternal grandparents. Her counseling could usefully focus on rapprochement of her relationship with her father. However, it seems that any attempt to institute these measures may precipitate a counter-reaction from Ashley's mother, and that she may again change residences to avoid cooperation, or may move to another state. (Emphasis in original)
 "3. Ashley's paternal grandparents have expressed an interest in joint custody with their son and this might be considered for the child, if the grandparents would agree that she would not have any contact with her father unless it is begun through counseling. However, such a placement would be likely to further alienate her mother from her and might therefore risk another type of emotional harm. Ideally, she might be placed in a foster home. Under any circumstances, any visits with her mother should be closely supervised.
 "4. Donanova should be referred for counseling to address the concerns raised in this evaluation. It seems that she will be very resistant to treatment under any circumstance. If her daughter is removed from the home, counseling should be required as a condition of visitation.
 "5. Ashley's paternal grandparents should at least have regular, unsupervised visits with her at this time. Steps should be taken to ensure that she continues to be available for these visits.
 "6. If she is removed from her present home, Ashley should not be placed with any family members who have not completed an evaluation of this sort.
 "7. If Ashley's grandparents are considered for CT Page 2627 custodial placement, they should participate in additional parental skills training with a particular emphasis on understanding the nature and risks of child sexual abuse so that they could protect her from any future threats."
 E Dr. Walid Jazari
Dr. Jazari was engaged by Donanova after, and in response to, the report of Dr. Anderson on October 16, 2000. The first visit to Dr. Jazari's office was less than thirty days before the trial. Dr. Jazari finds Donanova to be an adequate mother who suffers from an adjustment disorder. He finds the relationship between Donanova and Ashley to be normal. He believes that a "negative atmosphere" prevails "which is unfortunate" since it is in the best interest of Ashley to have a relationship with the grandparents.
Dr. Jazari did not find Donanova to be dangerous to the child in any way; he did not find Donanova to be delusional and the child was very relaxed and at ease with the mother. Dr. Jazari was wholly unwilling to answer any questions regarding the past difficulties except to offer that there is hostility between Donanova and the grandparents which must be resolved for the benefit of Ashley. "It is essential that she (Ashley) see her mother and her grandparents in a cordial relationship." He believes that Ashley is very attached to her mother and concedes that "there are probably reasons for punishing the mother." It was his belief that this case should be resolved in an amicable manner. He has prescribed medication for Donanova for clinical depression.
As earlier noted, this court recessed the case and continued the case for more than a month to allow Dr. Jazari to meet all the parties and to help establish the cordial relationship which he believed was necessary and achievable. The court notes that on examination by the child's attorney Dr. Jazari was asked about the two visits that were arranged during the month. One, a visit of three to four hours during which time the child met with some paternal relatives and went to a party which Dr. Jazari said Ashley enjoyed. A second visit was on January 6, 2001, a Saturday afternoon visit, where the child was taken by the grandparents to the Crystal Mall. Dr. Jazari said he asked Ashley to write a report about the visit. Dr. Jazari said "The visit was successful, however, she had certain issues with her grandmother." After some argument by counsel, the court permitted the written report by Ashley to be admitted into evidence as Plaintiff's Exhibit 32. The document is significant to the court in two respects. First, that a careful examination of the CT Page 2628 "report" shows that it was written by a child with normal age-appropriate mistakes which were corrected by an adult and the content of the letter bears the unmistakable hostile direction of the mother. The second thing which is significant to the court is that Dr. Jazari did not see through the transparency of this "report." Dr. Jazari's plan for the resolution of this case calls for continued therapy of all parties at his office for a year. He offered that maybe the visitation could occur in New Jersey in 2002 and that the child could possibly visit with her father in 2003.
 F Dr Deborah McGeehan
In a curious twist of developments, Deborah McGeehan Ph.D., became involved in this case as a therapist for "Ashley M" on January 12, 2000. She was engaged by the child's mother as a direct result of this litigation. She saw the child on seven or eight visits between January 12, and June 7, 2000. Two days before Ashley's first visit to Dr. McGeehan, the court had entered the stipulation ordering the psychological evaluation by Dr. Anderson. Dr. McGeehan, who has a separate practice, and Dr. Anderson, whose practice is known as Northeast Clinical Specialists, are married to each other. They report that once they became aware of this, they did not ever discuss the case. The report prepared by Dr. McGeehan was prepared after Dr. Anderson had concluded his clinical interviews and psychological testing. The reports are at extreme variance.
Dr. McGeehan's report, Plaintiff's Exhibit 31, and her testimony clearly focus on the child as the looser in this litigation. She was, according to the doctor, referred for stomach aches, nail biting and fear that these symptoms would worsen with contact with the paternal grandparents. The child didn't understand why the court would force her to visit with people who so intensely disliked her mother and who had been mean to her. The child was described as articulate and her use of language was quite well developed. The doctor did not know the basis for Ashley's beliefs, only that she believed them. Ashley seemed cooperative and was very comfortable with her mother. Ashley was quite aware of what could be evidence and was aware that she could give her opinion to the judge, Dr. McGeehan said. Ashley was aware of possible future scenarios of meeting her father, going to New Jersey, possible custody, possible incarceration of her mother and virtually all of Donanova's worst characterizations of prior life events involving the child's father and the grandparents. Dr. McGeehan stated that there has to be some kind of a truce.
 G
CT Page 2629 Findings of the Court and Orders:
All of the professional evaluators and clinicians agree that it is in the best interest of the child to have at least a visiting relationship with her paternal grandparents. The court finds specifically that a relationship with the paternal grandparents is in the child's best interest. As in many of these cases, the devil is in the details.
The most salient feature of this case is the contemptuous conduct of the plaintiff, Donanova F, now known as Donanova M. The court finds that she has utterly and wilfully violated the orders of the Rhode Island Family Court and the orders of this court with respect to visitation. It is well settled that the imposition of sanctions to compel the observance of its orders rests within the sound discretion of the trial court. Section 51-33 of the Connecticut General Statutes permits the court to impose a definite sentence of not more than six months imprisonment for an affront to the dignity and authority of the court, such as noncompliance with an order of the court. It is the order of this court that the plaintiff, Donanova M, is hereby committed to the custody of the Commissioner of Corrections for the maximum period of six months for her consistent wilful and flagrant violation of court visitation orders. The execution of the sentence is suspended and will be reviewed on September 14, 2001, or upon any earlier finding of violations of court orders.
An additional remedy available to the court in civil cases allows for the court to impose a fine, payable to the complainant for losses sustained. Demartino v. Monroe Little League, Inc 192 Conn. 271, 278
(1984). The grandparents have paid the entire $3,800 cost of Dr. Anderson for his evaluation. A fine is imposed upon the plaintiff in the amount of $3,800 to be paid to the grandparents at the rate of $100 per month commencing on March 15, 2001, and continuing monthly thereafter.
This court will also conduct a hearing with respect to the various motions for attorneys fees including the defendant grandparent's attorney's fees; the child's expenses for both an attorney and a guardian ad litem. Defendant's counsel shall file a claim slip for a hearing to coincide with the grandparent's scheduled trip to Connecticut.[5]
The issues of custody and visitation present the most vexing issues for the court. The court finds that the grandparents are suitable and worthy persons to provide for the care and custody of the minor child. The court has heard deeply conflicted testimony as to the viability of the plaintiff to continue as the custodian of this child. Goldstein, Solnit and Freud in their seminal work on child placement have suggested that a child should be awarded to the parent who will most likely make the child CT Page 2630 available to the other parent for visitation.[6] Indeed, the guardian ad litem for the child urgently argues for removal of the child from the plaintiff's home. The court finds support for this proposition in the notion that the child is being raised in a multi-generational home of parental failures. The child has been chronically manipulated by the plaintiff. There are no significant male role models for this child nor any significant interpersonal relationships for this child to observe. The child is acutely aware of the mother's distrust and hostility for any paternal familial involvement. The child is also aware of the mother's disregard and disrespect for the law. In this connection Donanova is belligerent and intransigent. There is little to recommend the mother for a custodial role except the child's attachment to her. The plaintiff has, however, worked that cord of binding to its very last strand. Her tyranny must end. The plaintiff must understand that the court's available options regarding her failure to observe the court orders are virtually exhausted. In the event the plaintiff fails to actively and genuinely support the orders of visitation, the court shall have little option but to award the child to the grandparents who are much more likely to obey the orders of the court and thereby instill a sense of respect for the law in this child. This concept, respect for the law, is the bedrock of a civilized nation and a civilized people.
Pending further review of this case on September 14, 2001, the child shall remain with the plaintiff mother. The grandparents shall have visitation as follows:[7]
A.) Friday February 23, 2001 at 5:00 PM until Sunday, February 25, 2001 at 4:00 PM.
B) Thursday March 22, 2001 at 6:00 PM until Sunday March 24, 2001 at 4:00 PM.
C) Sunday April 15, 2001 at 5:00 PM until Saturday April 21, 2001 at 11:00AM.
D) Saturday May 26, 2001 at 10:30 AM until Monday May 28, 2001 at 5:00 PM.
E) Sunday July 1, 2001 at 12:00 Noon until Saturday July 7, 2001 at 12:00 noon.
F) Sunday August 19, 2001 at 12:00 Noon until Saturday August 25th at 12:00 noon. The visitation shall be at any location and in any state the grandparents may choose. The pick-up and drop-off point shall be at the Friendly Ice Cream Shop, 608 West Main Street, (Marcus Plaza, Route 82) Norwich, CT. The child's father Timothy F, Jr. may visit with the child in the presence of the grandparents beginning July 1, 2001. CT Page 2631
The plaintiff is ordered to continue the child in treatment with the office of Dr. Walid Jazari no less often than one visit every other week until the mother and child are accepting and comfortable with visitation or until the next court hearing whichever event shall earlier occur.
Further visitation will be established on September 14, 2001. The parties are requested to begin a dialogue through counsel or directly amongst themselves, relative to a proposed long term visitation schedule and submit to the court proposed orders on September 14, 2001.
Judgment may enter accordingly,
Foley, J.