IN RE SHAQUANNA M. ET AL.*
(AC 19704)

Foti, Schaller and Dupont, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 15, 2000—officially released February 6, 2001

*Barbara J. Ruhe,* with whom, on the brief, were *Jonathan W. A. Ruhe* and *Jennifer L. Breuer,* legal intern, for the appellant (respondent mother).

*Mary K. Lenehan,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Opinion*

DUPONT, J. The primary issue of this appeal is whether the respondent mother, whose parental rights

in her three sons were terminated,[1] was denied procedural due process when the court denied her motion for a mistrial or a continuance. Her motion, made during the course of trial, was based on the death of the lawyer who the court had appointed as both attorney and guardian ad litem for her sons. The resolution of this issue necessarily requires an answer to the preliminary question of whether the respondent has standing to claim such a denial of due process. At the hearing on her motion for a mistrial or a continuance, the respondent claimed a due process violation of her children's rights and of her own rights.[2]

The following facts and procedural history are relevant to this appeal. The petitioner, the commissioner of children and families (commissioner), filed termination of parental rights petitions in October, 1998. Those petitions followed the respondent's July, 1998 petitions for revocation of the commitment of her five children to the custody of the commissioner. The court consolidated for trial the commissioner's petitions to terminate parental rights and the respondent's petitions.[3] All five of the respondent's children, including the three sons, A, T and F, who are involved in this appeal, have been

[1] The court dismissed petitions to terminate the parental rights with respect to the respondent mother's two daughters, and those judgments are not involved in this appeal. In the trial court, these consolidated petitions were captioned after one of those daughters, Shaquanna. The father of two of the respondent's three sons consented to the termination of his parental rights, and the court granted the petition to terminate the parental rights of the father of the third son, F. F's father has not appealed from that judgment. We refer in this opinion to the respondent mother as the respondent.

[2] In view of our conclusion as to the primary issue, we need not reach the respondent's claim that the grounds for termination were not proven by clear and convincing evidence and, therefore, that the court should not have terminated her parental rights as to all three sons, T, A and F.

[3] The court rendered judgments denying the respondent's petitions to revoke the commitment of her three sons to the commissioner. The respondent took no appeal from those judgments.

in and out of home placement through the department of children and families (department) since 1995. The children have suffered violent and physically abusive behavior when in their own home and, in the case of T and A, in the foster home in which the department had placed them. The latter two children were both institutionalized for in-patient psychiatric treatment and, as of the date of oral argument, remain in a hospital for such treatment. The state-placed foster home was a "chamber of horrors," worse than the parental home for the latter two of the respondent's sons.

The trial of the termination of parental rights and revocation of the commitment to the commissioner began in November and extended into December, 1998. The court then continued the trial to January, 1999, and, during that interim, the individual serving as the lawyer and guardian ad litem for the respondent's sons died.[4] The respondent moved for a mistrial or, alternatively, for a continuance[5] to provide the newly appointed person acting as both attorney and guardian ad litem for her sons with transcripts of the five days of testimony that had occurred prior to January, 1999.[6] A hearing was held on the respondent's motion.

---

[4] Neither we nor the parties are aware of any reported case in Connecticut involving the death of counsel during the course of a trial, with a motion for a continuance as a result. The case is one of first impression in Connecticut. Continuances in cases from other jurisdictions based on the death of counsel are rare. One such case involved the death of counsel while he was representing a party whose case was on appeal. Applying an abuse of discretion standard, the United States Supreme Court granted two continuances in a civil case for two terms because the matter was one of great moment and because new counsel should have had an opportunity to investigate the principles involved. See *Hunter* v. *Fairfax*, 3 Dall. 305 (1796).

[5] We decide this case on the basis of the motion for a continuance. In view of our conclusion that a new trial is necessary, we need not address the issue of whether the court should have granted the motion for a mistrial.

[6] At oral argument, the petitioner noted that she did not know if a court reporter or a court monitor was present at the trial. Counsel for the respondent stated that most of the trial was conducted with a court monitor present.

At the hearing on the motion for a continuance, the substitute attorney and guardian ad litem for the respondent's sons stated his position as follows: "I have an obligation, I think, a legal professional obligation, to represent these children competently. It's difficult calculus in this case based on the information that I have. If I felt in doing the calculus, if I felt the need, it's a close call in my view. And in some technical sense I would have loved to have been able to read through the transcript, however, with all the other information I've been able to look at and the investigation I've done into the matter, I don't believe it would serve the best interest of these children to prolong the matter at all. I mean that's the bottom line for me. . . . I don't think it's absolutely essential that I review the trial transcripts up to this point to fulfill my obligation to represent these children competently."

The court denied the respondent's motion for a mistrial or a continuance, and she challenges that decision in her appeal from the judgments terminating her parental rights.[7] The court found certain relevant facts that follow. From mid-1995, the respondent has maintained contact with the department and her children to the extent that the department has permitted. The court noted that "in her own, perhaps misguided way, the mother has shown that she is very interested in her children" and that "she is perhaps guilty of excessive contact with the children rather than insufficient contact." Accordingly, the court held that the evidence was not clear and convincing that the respondent had abandoned her children.[8]

---

[7] The attorney and guardian ad litem for the three sons did not file a separate brief in this appeal, but agrees with the arguments and positions expressed by the state.

[8] The petitions to terminate cited three grounds, namely, abandonment, no ongoing parent-child relationship and a failure to achieve personal rehabilitation. See General Statutes (Rev. to 1997) § 17a-112 (c) (3).

In May, 1997, the department suspended the respondent's visitation rights with all of her sons. As of the date of the termination hearing, two of the children, T and A, were probably not adoptable. The third child, F, was still in the foster home in which the department had placed him in 1995. That foster mother would probably not adopt him, however, due to her age, although it was contemplated that he would remain with her for the foreseeable future.[9] The court also found that F and the respondent have gotten along well and that the respondent has kept in contact with F. The court granted the petitions to terminate the respondent's parental rights as to all three children on the ground that for more than one year, she had failed to achieve personal rehabilitation and, as to T and A, on the additional ground that she had no ongoing parent-child relationship with them.

I

The petitioner claims that the respondent lacks standing to pursue a claim that the denial of her motion for a continuance violated due process. If standing does not exist, there is no subject matter jurisdiction, and we cannot review the respondent's claim.

There are two kinds of standing, that arising from statutory aggrievement and that arising from classical aggrievement. Here, no statute gives the respondent the specific right to seek the remedy of a mistrial or a continuance because of the death of counsel or the guardian ad litem for her children. She claims classical aggrievement instead because she has a colorable claim of a direct injury that she is likely to suffer, which need

---

[9] At the time of oral argument on the motion for a continuance, A was thirteen years old, born February 3, 1987; T was ten years old, born November 10, 1989; and F was six years old, born March 2, 1993. T has not seen his mother since December, 1996. A psychiatric social worker testified that A does not want to see his mother.

not be great, but is an injury that is personal, and in which she is specially involved. See *Connecticut Post Ltd. Partnership* v. *South Central Connecticut Regional Council of Governments,* 60 Conn. App. 21, 27, 758 A.2d 408, cert. granted on other grounds, 255 Conn. 903, 762 A.2d 907 (2000). In other words, she claims aggrievement in the classical sense by the denial of her motion, which aggrievement is peculiar and personal to her, and that she is entitled to appeal from the court's decision denying her motion. An individual establishes classical aggrievement if there is a possibility, not necessarily a certainty, that a legally protected interest is adversely affected. *Hall* v. *Planning Commission,* 181 Conn. 442, 445, 435 A.2d 975 (1980).

The United States Supreme Court has recognized that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky* v. *Kramer,* 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (listing Supreme Court precedent recognizing fundamental nature of right). The state has, however, an interest in preserving and promoting the welfare of a child. Id., 766. These interests conflict in cases involving the termination of parental rights, and state interference with the relationship between a parent and child is justified only in specific instances. The state must act in accordance with procedural due process in any interference with that relationship; *Lehrer* v. *Davis,* 214 Conn. 232, 237, 571 A.2d 691 (1990); and must prove a termination of parental rights by clear and convincing evidence, rather than by the lesser burden of a fair preponderance of the evidence. The desire and right of a parent to maintain a familial relationship with a child cannot be separated from the desire and best interest of a child either to maintain or to abandon that relationship, or the interest of the state in safeguarding the welfare of children. These legitimate interests of parent, child and

state require a balancing of the factors involved in those interests. See id., 240. In every case involving parental rights, a struggle exists between parents and the state to determine what is in the child's best interest, the child being the focus of the struggle. *Troxel* v. *Granville*, 530 U.S. 57, 86, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (Stevens, J., dissenting).

It is difficult to separate the right to federal due process[10] of the respondent from those of her children. She had a stake in the outcome of her motion for a continuance because whether the court granted it could affect the course of the trial and, ultimately, whether her rights as a parent would be terminated. At stake was the possible or probable direct injury to her of her right to retain her status as a mother. It is hard to understand how she could be more specially involved.

The inadequate representation of her children by an attorney or guardian ad litem could, at the very least, colorably harm her. A colorable claim of direct injury to her that she may suffer or is likely to suffer gives her standing. *Ramos* v. *Vernon*, 254 Conn. 799, 809, 761 A.2d 705 (2000). Inadequate representation of her children in the capacity of guardian ad litem could particularly harm her because it is in that capacity that the best interests of her children must be determined.[11] A

---

[10] The due process rights guaranteed by the federal constitution are the same as those guaranteed by the state constitution. *In re Alexander V.*, 25 Conn. App. 741, 742 n.1, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992).

[11] *Taff* v. *Bettcher*, 35 Conn. App. 421, 423, 646 A.2d 875 (1994), does not apply to the present case. In that case, the defendant mother, in a custody modification case incident to a dissolution of marriage, claimed that the trial court should not have conducted a hearing to modify custody and visitation without counsel for the minor child present. Id. This court concluded that the mother had no standing to assert the due process rights of her child. Id., 426. In the present case, the respondent is claiming not only that the children's attorney should have had more time to prepare for his representation of them, but also that his guardian ad litem role to pursue the best interests of her children has been compromised by a lack of time to prepare and by a lack of precise knowledge of the testimony of the

mother has standing to challenge a ruling that involves an alleged interference with her status as a parent. See id., 811; see also *In re Elizabeth M.*, 232 Cal. App. 3d 553, 565, 283 Cal. Rptr. 483 (1991) ("father has standing to assert his child's right to independent counsel, because independent representation of the children's interests impacts upon the father's interest in the parent-child relationship"). We conclude that the respondent has standing to pursue her claim that her motion for a continuance should have been granted.

## II

### A

Whether the denial of a continuance has been shown by the respondent to have interfered with her basic constitutional right to raise her children, thereby depriving her of procedural due process, is the issue of this case. Its resolution is a question of law for which our review is plenary. See *State* v. *Reilly*, 60 Conn. App. 716, 727, 760 A.2d 1001 (2000). The abuse of discretion standard "does not apply to constitutional . . . claims, which are reviewed de novo by the courts." *McNary* v. *Haitian Refugee Center, Inc.*, 498 U.S. 479, 493, 111 S. Ct. 888, 112 L. Ed. 2d 1005 (1991). The issue is not whether the termination of the parental rights of the respondent in this case was in the best interests of the children, which issue will be resolved at some future time, but whether a continuance was necessary to ensure the respondent's right to due process.

witnesses who already had testified before his appointment as guardian ad litem, which the transcripts could have provided. There is a significant difference between the standard of proof in custody modification cases involving the parents of a child and that in termination of parental rights cases. Also, the former cases concern modifiable orders, whereas the latter concern irrevocable judgments. We note, furthermore, that unlike the defendant in *Taff*, the respondent claims that the denial of her motion for a continuance prejudiced her own case. See *Schult* v. *Schult*, 40 Conn. App. 675, 687 n.10, 672 A.2d 959 (1996), aff'd, 241 Conn. 767, 699 A.2d 134 (1997).

The due process rights of the fourteenth amendment to the United States constitution apply in proceedings brought by the state to terminate parental rights. *In re Jessica B.*, 50 Conn. App. 554, 575, 718 A.2d 997 (1998). We first consider whether we should analyze the denial of the motion for a continuance in this case in terms of whether there was an abuse of discretion or in terms of whether there was a deprivation of constitutional due process.

Some cases seem not to distinguish between the two analyses. See *State* v. *Johnson*, 253 Conn. 1, 31, 751 A.2d 298 (2000). Other cases determine whether the particular ruling is constitutionally defective, and, if the court concludes that the ruling was not infirm on that basis, then such cases consider whether there was an abuse of discretion. See *State* v. *Castro*, 196 Conn. 421, 426, 493 A.2d 223 (1985); *State* v. *Cepeda*, 51 Conn. App. 409, 418, 723 A.2d 331, cert. denied, 248 Conn. 912, 732 A.2d 180 (1999). In rare instances, an abuse of discretion may implicate due process rights. *State* v. *DeMatteo*, 186 Conn. 696, 704 n.3, 443 A.2d 915 (1982). The petitioner's brief analyzes the facts of this case both in terms of the standard of abuse of discretion and deprivation of due process, whereas the respondent's brief analyzes the case in terms of the latter only.

A reviewing court ordinarily analyzes a denial of a continuance in terms of whether the court has abused its discretion. *Ungar* v. *Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964); *State* v. *Beckenbach*, 198 Conn. 43, 47, 501 A.2d 752 (1985). This is so where the denial is not directly linked to a specific constitutional right. *Anderson* v. *Sheppard*, 856 F.2d 741, 749 (6th Cir. 1988) (abuse of discretion to deny continuance in civil case for plaintiff to obtain his third counsel where trial court was allegedly biased and hostile toward plaintiff); *State* v. *Williams*, 200 Conn. 310, 321, 511 A.2d 1000 (1986) (abuse of discretion to deny con-

tinuance of proceedings until after sentencing of coconspirator); *Chaplin* v. *Balkus*, 189 Conn. 445, 448–49, 456 A.2d 286 (1983) (no abuse of discretion to deny continuance to enable better preparation for trial).

If, however, the denial of a continuance is directly linked to the deprivation of a specific constitutional right, some courts analyze the denial in terms of whether there has been a denial of due process. *Gardner* v. *Barnett*, 175 F.3d 580, 587–88 (due process violation to deny continuance to allow petitioner to produce crucial witness in contravention of sixth amendment right to present defense), rev'd, 199 F.3d 915 (7th Cir. 1999) (en banc), cert. denied sub nom. *Gardner* v. *Neal*, 529 U.S. 1079, 120 S. Ct. 1699, 146 L. Ed. 2d 504 (2000);[12] *Bennett* v. *Scroggy*, 793 F.2d 772, 777 (6th Cir. 1986) (due process violation to deny continuance to allow defendant time to present his only defense in contravention of sixth amendment); *Lee* v. *Winston*, 717 F.2d 888, 898–99 (4th Cir. 1983) (due process violation to deny continuance to allow defendant's counsel to prepare argument as to whether removal of bullet from defendant's body would violate his fourth amendment rights), aff'd, 470 U.S. 753, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985).

Even if the denial of a motion for a continuance on the ground of lack of due process can be directly linked to a claim of a denial of a specific constitutional right, if the reasons given for the continuance do not support any interference with the specific constitutional right, the court's analysis will revolve around whether the trial court abused its discretion. *State* v. *Bethea*, 167 Conn. 80, 85–87, 355 A.2d 6 (1974) (no abuse of discretion to deny continuance despite deprivation of sixth amendment claim when no showing that defendant

---

[12] Although the United States Court of Appeals for the Seventh Circuit, en banc, reversed the finding of a due process violation, it analyzed the denial of the continuance in terms of a due process violation rather than an abuse of discretion.

attempted to find alibi witness, that witness would establish alibi defense or that witness available). In other words, the constitutional right alleged to have been violated must be shown, not merely alleged. See *Whyte* v. *Commissioner of Correction*, 53 Conn. App. 678, 682–83, 736 A.2d 145, cert. denied, 250 Conn. 920, 738 A.2d 663 (1999); see also *Lozada* v. *Deeds*, 498 U.S. 430, 432, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991).

As we have noted, many cases involving motions for a continuance do not divorce a claim of a denial of due process from one claiming an abuse of discretion and discuss both. In this case, we analyze the respondent's claim in terms of a denial of due process for the following reasons.

Discretion involves a choice by a court to do or not to do something that one cannot demand as an absolute right. Courts exercise discretion in cases where impartial minds could hesitate, which exercise usually entails a balancing of the relative gravity of the factors involved. See *State* v. *Onofrio*, 179 Conn. 23, 29, 425 A.2d 560 (1979). An abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. Some cases involving motions for a continuance analyze the facts in terms of discretion and then state that some denials are so arbitrary as to violate due process. In *Ungar* v. *Sarafite*, supra, 376 U.S. 589, the United States Supreme Court stated: "The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process . . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." (Citations omitted.) In *Gandy* v. *Alabama*, 569 F.2d 1318, 1328 (5th Cir. 1978), the court stated: "[W]e do not disparage the traditional notion that a motion for a continuance is commit-

ted to the trial court's discretion, in the first instance. We simply perform in our role of reviewing the exercise of discretion for abuse of constitutional dimension." An abuse of discretion occurs when an injustice has been done. See *Montanaro Bros. Builders, Inc.* v. *Snow*, 4 Conn. App. 46, 54, 492 A.2d 223 (1985). Discretion implies the absence of a hard and fast rule or a mandatory procedure regardless of the circumstances. *State* v. *Corchado*, 200 Conn. 453, 464, 512 A.2d 183 (1986).

A denial of constitutional due process, when shown by the particular facts, does not involve discretion because due process is an absolute right guaranteed by the constitution and allows the court no choice. "Due process" may be a phrase impossible of precise definition, but when an act is shown by reliable facts to affect a specific constitutional right, such as the constitutional interests of parents in their children, the analysis should turn on whether a due process violation exists rather than whether there has been an abuse of discretion. A discretionary act and an act requiring due process are mutually exclusive.

Decisions to grant or to deny continuances are very often matters involving judicial economy, docket management or courtroom proceedings and, therefore, are particularly within the province of a trial court. *State* v. *Stevenson*, 53 Conn. App. 551, 562, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999). Whether to grant or to deny such motions clearly involves discretion, and a reviewing court should not disturb those decisions, unless there has been an abuse of that discretion, absent a showing that a specific constitutional right would be infringed.

Courts analyze termination of parental rights cases involving procedural due process claims using the test articulated in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), rather than using

an abuse of discretion standard. *In re Alexander V.,*
223 Conn. 557, 560, 613 A.2d 780 (1992); *In re Juvenile
Appeal (Docket No. 10155),* 187 Conn. 431, 435, 446
A.2d 808 (1982).[13] Before discussing the *Mathews* test,
we note that the difference in the two analyses relates to
the lack of discretion involved in providing procedural
safeguards to satisfy procedural due process when deal-
ing with the irrevocable severance of a parent's rights,
as opposed to the presence of discretion in granting or
denying a continuance in the garden variety civil case
with its lesser standard of proof.

*Mathews* and *In re Alexander V.* concern procedural
due process in situations where the claim is a denial
of an evidentiary hearing, rather than a denial of a
motion for a continuance. Because due process in termi-
nation of parental rights cases calls for such procedural
safeguards as the particular situation demands;
*Mathews* v. *Eldridge,* supra, 424 U.S. 334; we equate a
motion for a continuance with a motion for an eviden-
tiary hearing in this case and use the *Mathews* test. We,
therefore, analyze this case in terms of whether there
was a denial of due process, rather than in terms of
whether there was an abuse of discretion.

---

[13] We note that our Supreme Court in *In re Juvenile Appeal (Docket No.
10155),* analyzed the motion for a continuance in terms of a due process
violation, although the court arrived at a conclusion different from our
conclusion in this case. *In re Juvenile Appeal (Docket No. 10155)* holds
that there was no due process violation in failing to grant the father's motion
for a continuance until his release from prison, unlike our holding in the
present case. *In re Juvenile Appeal (Docket No. 10155),* supra, 187 Conn.
440. The different holdings result from factually dissimilar cases. The facts
of *In re Juvenile Appeal (Docket No. 10155)* differ in that a complete
transcript of the state's principal witnesses was sent to the father, who
was incarcerated in California; the father's prison release was anticipated
approximately nine months from the date of the motion; the father testified
by telephone from the California prison, with his voice audible to all at
the hearing in Connecticut; counsel for the petitioner and the child cross-
examined him; and the record contained no rejection by either state to pay
the father's transportation expenses to the Connecticut courtroom.

## B

The United States Supreme Court established a three-pronged balancing test in *Mathews* to determine what safeguards the federal constitution requires to satisfy procedural due process. Courts apply that balancing test when the state seeks to terminate parental rights. *Santosky* v. *Kramer*, supra, 455 U.S. 754; *In re Alexander V.*, supra, 223 Conn. 560. The three factors to be considered are (1) the private interest that will be affected by the state action, (2) the risk of an erroneous deprivation of such interest, given the existing procedures, and the value of any additional or alternate procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens attendant to increased or substitute procedural requirements. *Mathews* v. *Eldridge*, supra, 424 U.S. 335. The bottom-line question is whether the denial rendered the trial fundamentally unfair in view of the *Mathews* factors.

The private interest here is the constitutional right of a mother to retain her status as a mother. The burden on the state if a continuance were granted is slight in terms of dollars or increased administration. The second factor of *Mathews*, however, may not be dismissed so summarily. We conclude, however, that the risk of erroneous deprivation of parental rights was present and that there was value in the additional procedural safeguard. In the present case, the respondent moved for a continuance based on the death of the person originally appointed as both attorney and guardian ad litem for her three sons.[14] The respondent was at risk of being erroneously deprived of the companionship and love of her children because of the failure to con-

---

[14] In the present case, no party alleges any impropriety because of the duality of the roles on the part of either the original or successor attorney and guardian ad litem.

tinue a trial for a relatively short time. The continuance, a procedural safeguard, should have been granted. It would not have compromised or disregarded the government's interest, the third *Mathews* prong, in the well-being of the children or materially increased its financial or administrative burdens. This is an extremely close case, but on the basis of a careful review of all the facts, we conclude that the hearing on the motion for a continuance did not obliterate the need for a continuance.

Courts do not condone the policy of appointing one person to fill the different roles of guardian ad litem and attorney.[15] A child's attorney is an advocate for the child, while a guardian ad litem is a representative of a child's best interest. *Ireland* v. *Ireland*, 246 Conn. 413, 439, 717 A.2d 676 (1998). "[A] distinction between the two roles is proper. An attorney for the child should not express to the court, in advance of trial, his or her opinion as to the best interests of the child . . . . An attorney for the child should participate in legal proceedings by submitting trial briefs, questioning witnesses, giving oral argument, and, generally, by functioning in a manner similar to an attorney for an unimpaired adult." Id., 440.

The child's attorney has a duty to heed the wishes of his client, whereas the guardian ad litem has a duty to consider the needs of the child. The attorney for the children may have been able to represent their wishes by talking to them. He could not, as guardian ad litem, however, in the best way possible, assess their best

---

[15] The respondent's two daughters had two different counsel, one who acted as attorney for the daughters and the other who acted as guardian ad litem for them. The former opposed the termination of parental rights, whereas the latter supported termination. The court concluded that the termination of the respondent's parental rights as to her daughters was not in their best interests.

interests without the benefit of the transcripts or the tapes of the transcripts, if available.

The state's primary interest in terminating parental rights is to free the child for adoption or to free the child of uncertainty. The children here were not immediately adoptable, if ever. Thus, the only reason for haste was to free the children from uncertainty. In view of the ages of the children and their current living arrangements, a few more weeks in parent-child limbo was not unreasonable when balanced against the constitutional rights of their mother and their right to have their future decided in their best interests.

The judgments of the trial court are reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.