TOWN OF WEST HARTFORD *v.* MURTHA CULLINA, LLP, ET AL.
(AC 25062)

Foti, Dranginis and Bishop, Js.

Argued May 3—officially released September 14, 2004

*William H. Clendenen, Jr.*, with whom were *R. Bartley Halloran* and, on the brief, *Nancy L. Walker* and *Kevin C. Shea*, for the appellant (plaintiff).

*William H. Prout, Jr.*, with whom, on the brief, were *Timothy A. Diemand* and *Erika L. Amarante*, for the appellee (named defendant).

*Roy L. Reardon*, pro hac vice, with whom were *James R. Fogarty* and, on the brief, *Robert A. Bourque*, pro hac vice, and *Ann G. Rappleye*, for the appellee (defendant Hawkins, Delafield and Wood).

*Opinion*

BISHOP, J. The plaintiff, the town of West Hartford, appeals from the judgment of the trial court rendered after the court granted motions filed by the defendants, Murtha Cullina, LLP (Murtha Cullina) and Hawkins, Delafield and Wood (Hawkins Delafield), to dismiss for lack of standing. On appeal the plaintiff claims that the court (1) improperly dismissed its complaint for lack of standing, (2) deprived it of due process by denying its motion for an evidentiary hearing and (3) improperly denied its motion for a continuance and discovery. We affirm the judgment of the court.

The following facts and procedural history are relevant to our resolution of the issues on appeal. Connecticut Resources Recovery Authority (CRRA), a quasi-public corporation, owns and operates numerous waste management facilities in the state of Connecticut. Pursuant to its statutory responsibilities, CRRA established resource recovery facilities to receive and burn solid waste materials from municipalities and to generate electricity from its disposal process. One of CRRA's projects, known as the Mid-Connecticut system (Mid-Conn), provided waste removal for approximately sixty-seven municipalities, including the plaintiff. The plaintiff and the other municipal participants in Mid-Conn entered into contracts with CRRA for CRRA to provide trash removal services to the towns in return for service payments by the towns equal to CRRA's net operating costs. As a by-product of its waste disposal activities,

CRRA generated electricity, which it, in turn, sold to the Connecticut Light and Power Company (the utility), pursuant to the provisions of a long-term contract between CRRA and the utility. Because the level of the towns' obligations to CRRA was a function of CRRA's operating costs, the towns benefited from the fact that the payments to CRRA from the utility reduced CRRA's net operating costs.

Prior to 1998, the contract between CRRA and the utility required the utility to purchase all steam generated by the Mid-Conn system through 2012, at a price equivalent to eight and one-half cents per kilowatt hour. By the late 1990s, however, that price had become substantially higher than the market price for this form of energy. As a result of energy deregulation legislation passed by the General Assembly in 1998, CRRA and the utility were required to renegotiate the terms of their contract to reflect the new economic realities of a deregulated energy market. As a practical matter, this legislation required that the utility make a substantial payment to CRRA in order to buy out its obligation to purchase steam through 2012, at an above market price. The ensuing transactions involving the utility, CRRA and Enron Power Marketing, Inc. (Enron Power) spawned the present litigation.

The defendants represented CRRA in its negotiations for the restructuring of its contract with the utility. The defendants originally drafted an agreement that required the utility to pay $290 million to CRRA in order to be relieved of its long-term contractual obligation to purchase steam from CRRA. These terms, however, were subsequently renegotiated with the assistance of the defendants and the involvement of Enron Power. The new agreement required the utility to pay $220 million to Enron Power and $70 million to CRRA, and that Enron Power would assume the utility's long-term steam purchase obligation to CRRA. This required a

monthly payment of $2.2 million by Enron Power to CRRA from the agreement date through 2012. Enron Power's obligation to CRRA was guaranteed by Enron Power's parent company, Enron Corporation (Enron).

On December 2, 2001, Enron and its affiliated entities, including Enron Power, filed a petition for bankruptcy. Enron Power has failed to perform its obligations under the agreement negotiated by the defendants. As a consequence, Enron Power and Enron owe CRRA approximately $200 million.

On March 14, 2002, the plaintiff initiated the present action against the defendants. In its complaint, the plaintiff alleged that the defendants provided negligent representation to CRRA in regard to the restructuring of CRRA's contract with Enron Power. The plaintiff further alleged that as a consequence of the defendants' negligence, the Mid-Conn towns are now required to pay CRRA increased waste disposal fees to make up for CRRA's loss of revenue occasioned by Enron's failure to pay CRRA the monthly sum of $2.2 million. The plaintiff also alleged that the conduct of Murtha Cullina constituted an unfair or deceptive trade practice in violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Lastly, the plaintiff alleged that it was a third party beneficiary to the contract between CRRA and Hawkins Delafield for legal services, and that Hawkins Delafield breached that contract because it negligently performed those services.

Both defendants moved to dismiss the plaintiff's claims for lack of standing. They argued that, as a matter of law, the plaintiff's claims were too remote, indirect and derivative of the injuries that CRRA may have suffered for the plaintiff to have standing to bring them, and that a pending action brought by the attorney general of the state of Connecticut on behalf of CRRA against the defendants is the more direct vehicle for asserting the

claims made in this action. In response, the plaintiff argued that its claims were direct and that CRRA's claims against the defendants could not adequately vindicate its rights. It also requested the opportunity to conduct discovery and to have an evidentiary hearing in conjunction with the defendants' motions to dismiss on the basis of its assertion that there were disputed issues of fact relevant to the court's jurisdiction that had to be explored further before the court could make its ruling.

On October 2, 2002, the court denied the plaintiff's request for discovery and an evidentiary hearing, and on October 21, 2002, oral argument was presented on the defendants' motions to dismiss. On November 4, 2002, the court granted the defendants' motions and rendered judgment thereon. Relying on *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 356, 780 A.2d 98 (2001), the court concluded that the plaintiff lacked standing because its injuries were too remote and, additionally, that CRRA was a better suited party to assert the claims. This appeal followed.

I

The plaintiff first claims that the court improperly granted the defendants' motions to dismiss for lack of standing. Specifically, the plaintiff argues that its claims were direct and were not derivative of the claims asserted by CRRA in the separate litigation. We disagree.

We begin by discussing the legal principles that guide our inquiry. "A motion to dismiss [for lack of standing] . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court. . . . A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the trial

court's ultimate legal conclusion and resulting grant of the motion to dismiss [is] de novo." (Internal quotation marks omitted.) *Blumenthal* v. *Barnes*, 261 Conn. 434, 442, 804 A.2d 152 (2002).

"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 486, 815 A.2d 1188 (2003). "The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue." *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 347.

Recently, our Supreme Court adopted a three part policy analysis to determine whether a party has standing. "First, the more indirect an injury is, the more difficult it becomes to determine the amount of [the] plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the . . . acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two

problems is unnecessary where there are directly injured parties who can remedy the harm without these attendant problems." (Internal quotation marks omitted.) Id., 353. These policy considerations apply equally to claims brought under CUTPA. See *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 92, 793 A.2d 1048 (2002) (plaintiff's injuries too remote in relation to defendant's conduct, plaintiff lacks standing to assert CUTPA claim against defendant). With those principles in mind, we address the plaintiff's claim.

In its appellate brief, the plaintiff details the nature of its relationship with CRRA as well as the harm it allegedly suffered as a result of Enron Power's inability to pay CRRA in accordance with the terms of the agreement. The plaintiff's recitation, however, fails to satisfy the third policy consideration in *Ganim*. As we previously noted, "struggling with the first two problems is *unnecessary* where there are directly injured parties who can remedy the harm without these attendant problems." (Emphasis added; internal quotation marks omitted.) *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 353. It is undisputed that the state's attorney general, as the authorized representative of CRRA, has initiated two lawsuits seeking to recover approximately $200 million owed to CRRA by Enron. The attorney general is pursuing this claim in a bankruptcy proceeding now pending in federal court. Additionally, the attorney general has filed a separate civil action against the defendants alleging the same claims that the plaintiff has asserted here. Accordingly, in light of the third policy factor of *Ganim*, regarding the propriety of denying standing when a party with a more direct interest has asserted the same claim against the defendants in a different action, we conclude that the plaintiff lacks standing to bring its negligence and third party beneficiary claims because there is a more directly injured party, CRRA, that can vindicate its rights

through direct litigation.[1] Additionally, because the *Ganim* factors apply equally to a CUTPA claim, the plaintiff also lacks standing to assert that claim against the defendants.[2]

The plaintiff argues that the court misapplied *Ganim* by relying exclusively on the third factor when reaching its decision.[3] *Ganim*, however, makes it explicitly clear that if the court finds that there is a better suited, directly injured party to bring suit, the third factor can be dispositive without the requirement of further analysis. See id., 353. ("[t]he third factor is that struggling with the first two problems is *unnecessary* where there are directly injured parties who can remedy the harm without theses attendant problems" [emphasis added]). We conclude that the court properly applied *Ganim* in its analysis of the defendants' motions.

The plaintiff also argues that in deciding *Ganim* our Supreme Court relied on federal cases that were later overturned by the United States Court of Appeals for the Second Circuit, and that because the cases relied

---

[1] The plaintiff also argues that the court incorrectly decided issues of fact bearing on the plaintiff's third party beneficiary claims. Even if this assertion is correct, the record reflects that all of the alleged "issues of fact" decided by the court related to the first two *Ganim* factors. None, however, bore on the third and dispositive *Ganim* factor. Consequently, the claim that the court incorrectly decided issues of fact is of no aid to the plaintiff.

[2] The plaintiff argues that *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 90, is applicable to its CUTPA claim as *Vacco* involved an antitrust claim. This claim is patently without merit as *Vacco* makes it explicitly clear that *Ganim* applies to CUTPA claims. Id., 92.

[3] The plaintiff also argues that it has satisfied the third prong of *Ganim* as the lawsuits initiated by CRRA are insufficient to adjudicate its claim that the defendants improperly advised CRRA to divert $70 million from the Mid-Conn project. We note that this allegation is not contained in the complaint and was not raised in the trial court. We decline to address this unpresented and unpreserved claim on appeal. See Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial").

on by the Supreme Court in deciding *Ganim* were subsequently overturned, the holding of *Ganim* should not be binding on this court.[4] In making this argument, the plaintiff misconstrues the relationship between this court and our Supreme Court. Regardless of whether the cases relied upon by the Supreme Court in *Ganim* were later overruled or limited by the Second Circuit, our obligation is to follow *Ganim* until the Supreme Court overrules or limits it. It is axiomatic that the trial court and this court are without authority to overrule the decisions of our Supreme Court. In the absence of direction by our Supreme Court, inferior courts must continue to adhere to its decisions. Accordingly, this claim must fail.[5]

## II

The plaintiff next claims that the court deprived it of due process by dismissing its complaint without first holding an evidentiary hearing. Specifically, the plaintiff claims that there were disputed issues of fact relevant to the issue of jurisdiction, and that due process considerations entitled it to explore those factual issues in conjunction with the then pending motions to dismiss. We disagree.

We begin by addressing the legal principles that guide our review. "Inquiry into whether particular procedures are constitutionally mandated in a given instance requires adherence to the principle that due process is flexible and calls for such procedural protections as

[4] The plaintiff makes a similar argument with respect to *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 92. For the same reasons that the plaintiff's argument with respect to *Ganim* fails, this argument likewise fails.

[5] The plaintiff also argues that our Supreme Court's decision in *AvalonBay Communities, Inc.* v. *Orange*, 256 Conn. 557, 567–69, 775 A.2d 284 (2001), is inconsistent with *Ganim*, and we should apply *AvalonBay* and not *Ganim*. Again, we are without authority to overrule our Supreme Court. Furthermore, these opinions are not inconsistent, as *Ganim* reflects a further elucidation of, and not a departure from, our bedrock jurisprudence of standing.

the particular situation demands. . . . There is no per se rule that an evidentiary hearing is required whenever a liberty interest may be affected. Due process . . . is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . In the absence of any disputed facts pertaining to jurisdiction, a court is not obligated to hold an evidentiary hearing before dismissing an action for lack of jurisdiction." (Citations omitted; internal quotation marks omitted.) *Pinchbeck* v. *Dept. of Public Health,* 65 Conn. App. 201, 208–209, 782 A.2d 242, cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001).

The plaintiff argues that it was entitled to an evidentiary hearing to afford it an opportunity to cross-examine the defendants' witness in order to illustrate the inaccuracies in an affidavit filed by the defendants and to introduce other evidence to demonstrate its direct interest in asserting its claims. Although the plaintiff has made the broad assertion that it should have been allowed to present further evidence to bolster its claim of standing, the plaintiff has failed to identify the manner in which any of these allegedly disputed facts could have affected the court's determination that it lacked jurisdiction. Indeed, all of the alleged disputed facts urged on us by the plaintiff concern the first two *Ganim* factors; none of them relates to the third and decisive factor. Therefore, even if the court had afforded the plaintiff an opportunity for an evidentiary hearing, the evidence the plaintiff sought to adduce would not have affected the court's ultimate conclusion that the plaintiff lacked standing because there was a more directly injured party to bring the lawsuit. Accordingly, the plaintiff's due process rights were not violated by the court's determination not to permit an evidentiary hearing in conjunction with the defendants' motions to dismiss.

## III

Lastly, the plaintiff claims that the court violated its due process rights by denying it a continuance to obtain discovery, and, in the alternative, that the court's refusal was an abuse of discretion. We disagree.

We first set forth our standard of review. In general, we review a denial of a motion for a continuance to obtain discovery under an abuse of discretion standard. See *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 60, 459 A.2d 503 (1983). If the denial of the continuance, however, is directly linked to a constitutional right, we will review the claim de novo. See *In re Shaquanna M.*, 61 Conn. App. 592, 600–601, 767 A.2d 155 (2001). The plaintiff contends that we should afford its claim de novo review as the denial was directly linked to a constitutional right. See Conn. Const., art. I, § 10. The plaintiff's argument misstates the nature of article first, § 10, of the constitution of Connecticut, which curtails the legislature's power to unduly restrict a right that existed at common law prior to the adoption of our Constitution in 1818. *Gentile* v. *Altermatt*, 169 Conn. 267, 286, 363 A.2d 1 (1975) ("[t]he adoption of article first, § 10, recognized all existing rights and removed from the power of the legislature the authority to abolish those rights in their entirety"), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). The plaintiff has not pointed to and we are not aware of any relationship between this constitutional provision and the authority of the court to grant or deny a continuance in conjunction with a pending motion. Consequently, as the motion is not directly linked to a constitutional right, we review the court's denial of the plaintiff's motion for a continuance in order to conduct discovery under an abuse of discretion standard. The ultimate issue in our review, therefore, is whether the court reasonably could have ruled on the plaintiff's motion for a continuance as it did.

Practice Book § 13-2 provides in relevant part: "In any civil action . . . where the judicial authority finds it reasonably probable that evidence outside the record will be required, a party may obtain in accordance with the provisions of this chapter discovery of information or disclosure . . . whether the discovery or disclosure relates to the claim or defense of the party seeking discovery . . . . Discovery shall be permitted if the disclosure sought would be of assistance in the prosecution or defense of the action . . . ." Our focus, therefore, is on whether the information that the plaintiff sought to obtain would have facilitated the prosecution of its claims.

The plaintiff argues that discovery was required because the defendants were in possession of material that would establish that it had standing to bring this action. The plaintiff, however, again fails to set forth how obtaining that information could have affected its standing to assert its claims. Similar to its claim concerning its request for an evidentiary hearing, the additional discovery sought by the plaintiff relates to the first two factors of *Ganim and not to the dispositive third factor.* Because the additional discovery, even if favorable to the plaintiff, could not have influenced the court's ultimate conclusion, it was not an abuse of discretion for the court to deny the plaintiff's request for a continuance.

The judgment is affirmed.

In this opinion the other judges concurred.