STATE OF CONNECTICUT *v.* EDITH J. VARELA
(AC 28070)

Flynn, C. J., and DiPentima and Foti, Js.

Argued March 16—officially released July 7, 2009

*Neal Cone,* senior assistant public defender, for the appellant (defendant).

*Rocco A. Chiarenza,* special deputy assistant state's attorney, with whom, on the brief, were *Scott J. Murphy,* state's attorney, and *Kevin Murphy,* senior assistant state's attorney, for the appellee (state).

### Opinion

FLYNN, C. J. The defendant, Edith J. Varela, appeals from the judgment of conviction, rendered after a trial by jury, of accessory to larceny in the first degree in violation of General Statutes §§ 53a-8 and 53a-122 (a) (2), conspiracy to commit larceny in the first degree in violation of General Statutes §§ 53a-48 and 53a-122 (a) (2) and accessory to burglary in the third degree in violation of General Statutes §§ 53a-8 and 53a-103. On appeal, the defendant claims that the evidence was insufficient to sustain her conviction on each of the charges because the state could not prove her involvement in the crimes. We affirm the judgment of the trial court.

The following facts reasonably could have been found by the jury. As of February 22, 2005, the defendant had worked for Check Stop of Connecticut (Check Stop) for approximately three years. Check Stop is licensed by the state, and it has several branch locations throughout the state. Check Stop provides traditional banking services, such as check cashing, money orders and bill payment for its customers, all for a fee. The defendant was the store manager for the New Britain branch of Check Stop (store), located at 121 Main Street.

The front entrance of the store had two glass doors, separated by a steel pole that enabled the locking system to function. The lobby of the store, which was the only area in which customers were allowed, was eighteen feet long by sixteen feet, ten inches wide. To gain entrance to the back area, employees had to be buzzed in or had to use a key. Once they entered the first secure area, they entered what was known as a "mantrap," which was similar to a small closet. The employees then had to enter another door that also could be accessed only with a key or via a buzzing system. In the employee area, there was a small bathroom on one side of the room and what was known as the "safe room" on the other side. The safe, which had a dial lock combination system, was located in the safe room. There also were motion sensors throughout the store, but the store did not have security cameras. There was no exit from the employee area except through the mantrap into the lobby. No one, other than an employee, was allowed in the employee area, including the bathroom, without the permission of the general managers, Christopher Pierce and Gabrielle Pierce.

Christopher Pierce thought the defendant had been a good employee and that she was very trustworthy. However, shortly before Christmas in 2004, Christopher Pierce noticed that the defendant had changed since she began dating a store customer. Christopher Pierce noticed that the defendant's attitude changed and that she began breaking store rules, including allowing her boyfriend into the employee area and cashing checks for him without charging the required fee.[1]

On February 22, 2005, the defendant was working at the store. For a few hours that day, Luis Escalera, a part-time employee, covered for the defendant because

---

[1] Employees were allowed to cash one check per week for a member of their immediate family without charging a fee.

she had an appointment with her attorney. Although unusual for a Tuesday, the Pierces arrived while Escalera was working that day, and they remained at the store until approximately ten minutes after the defendant returned to work at about 1:30 p.m. While working, Escalera remained at the teller window in the secure area the entire time, and he did not allow anyone other than the Pierces and the defendant into that area. He left the store shortly after the defendant returned to work and before the Pierces left. The defendant was the only employee remaining at the store after the Pierces departed, except that Christopher Pierce testified that he may have returned for a short time just to drop off some $1 bills, but he was not certain of that.

When her shift was nearing completion at the end of the day, at approximately 6 p.m., the defendant proceeded to count all of the money in the store, including that which was in the safe. The defendant counted approximately $248,000. At about that time, the defendant received a cellular telephone call from Alex Breton, a former district manager of Check Stop, who also was the former boyfriend of Gabrielle Pierce. Breton had trained the defendant and other employees while serving as district manager. Breton had been fired from the Meriden Check Stop in 2003 or 2004, before that store had been burglarized. That burglary has never been solved. The defendant received calls from Breton's cellular telephone at 2:18 p.m. and at 6:01 p.m. on the day of the burglary, despite having denied to Christopher Pierce that she stayed in contact with Breton. Cellular telephone records revealed that Breton's New York registered cellular telephone was in the New Britain area when he made a call to the defendant's cellular telephone at 6:01 p.m. Someone using Breton's Manhattan landline telephone called the defendant's cellular telephone at 7:38 p.m. and, then, called Breton's cellular

telephone at 7:53 p.m.; at that time, Breton's cellular telephone was in the New Haven area.

At 6:45 p.m., the defendant printed the transactions list for the day, closed the safe and sent a facsimile report to the main office. She punched out shortly after 7 p.m., telephoned Christopher Pierce, as she did at the end of every workday, to tell him that she was leaving the store, and she activated the alarm system using her personal pass code. Christopher Pierce heard the defendant enter her pass code because the buttons make a beeping sound when pressed. The alarm company recorded the alarm being set at 7:04:56 p.m.

At 7:33 p.m., the alarm company received notification that the alarm on the door to the safe had been triggered. A few seconds later, the motion sensor in the rear of the store was triggered, followed by the motion sensor in the front of the store, in the mantrap and at the front door. All of this took approximately twelve seconds. The alarm company notified the Pierces, who were very concerned because the series of alarms indicated that the safe alarm was the first to have been triggered. Gabrielle Pierce telephoned the defendant and asked her to respond to the store immediately and to let in the police, which the defendant agreed to do, explaining that she was nearby, behind the store, with her boyfriend, who had a liquor store on nearby Arch Street. The Pierces left their Enfield home and drove to the store.

When the police arrived, they found no evidence of forced entry, but the front door was opened. When the defendant arrived, she let police into the secure areas using her key, where they discovered that the safe was open and the money was gone. The defendant did not appear surprised. Gabrielle Pierce and an employee of the alarm company testified that one need only close the safe and the doors in the store before setting the

alarm and that, as long as the doors were closed, even if they were not locked, the alarm would not go off until either the safe or one of the doors was opened.

On April 5, 2005, the New Britain police arrested the defendant for her role in the store burglary. Subsequently, the state charged the defendant with accessory to larceny in the first degree, conspiracy to commit larceny in the first degree and accessory to burglary in the third degree. After a jury trial, the defendant was convicted on all counts and sentenced to a total effective term of fifteen years incarceration, execution suspended after seven years, followed by five years of probation. The defendant thereafter filed a postverdict motion for a judgment of acquittal, which the court denied. This appeal followed. Following oral argument in this appeal, we requested the parties to submit supplemental briefing addressing each element of the crimes charged and what evidence, if any, there was to support those elements.

On appeal, the defendant claims that the evidence presented at trial was insufficient to sustain a conviction for any of the crimes with which she was charged and convicted. The defendant explains that the "gist of the state's theory of the case was that because the safe alarm went off first and the front door alarm last, someone had to have been in the safe room or work area before the security system was armed by the defendant, and that [the defendant] would have had to know of this, which meant that she helped bring about a plan to steal the money in the [store] on February 22, 2005." She argues, however, that the jury improperly found her guilty on the basis of mere speculation, without sufficient evidence. The defendant concedes that the money was missing from the safe and that its taking was an inside job. She challenges, however, the sufficiency of the evidence to prove that she knowingly participated in the theft. Although the evidence in this

case was scant, we conclude that there was sufficient evidence to sustain the conviction. Because the defendant concedes that all of the elements for each crime were proven, with the exception of proving that it was she who knowingly permitted a person to remain in the store for the purpose of taking the money, we address only the issue of the evidence related to identity in this appeal.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating

evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 542–43, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

Nevertheless, "[b]ecause [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion,

the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Elsey*, 81 Conn. App. 738, 744–45, 841 A.2d 714, cert. denied, 269 Conn. 901, 852 A.2d 733 (2004).

The defendant argues that the jury found her guilty on the basis of mere speculation. She makes much of the fact that the evidence demonstrated that there was no place that an individual could have hidden in the store other than in the bathroom if the door was closed and that the prosecutor argued to the jury, with no basis in the evidence, that it would be "ridiculous" to conclude that the defendant could have been at work from 1:30 p.m. to 7 p.m. and not have used the bathroom, that someone could have hidden in there all of that time or that the defendant would not have been concerned because the bathroom door was closed. She argues that the prosecutor's argument caused the jury to speculate, with no basis in the evidence, that the bathroom door normally was opened, that the defendant would have known if there was someone hiding in the bathroom, that the defendant could not go five and one-half hours without using the bathroom and that it would be impossible for a person to have hidden in the bathroom all of that time.[2] The defendant contends that it is very

---

[2] Specifically, the prosecutor argued: "And, you're going to tell me that [the defendant] sat there in this work area by herself, because that's her job, for five and one-half hours without using the bathroom or without wondering why that door [was] closed. . . . And, then—so, I—again, you have to use your common sense, there was nobody in there. . . . This is not like going into Shaw's [supermarket] and using the bathroom and hiding in the bathroom there, or a convenience store where you can go into the bathroom, and maybe the person there doesn't know that you're there, maybe forgets to check the bathroom. . . . I mean, it's ridiculous. The idea that somebody sitting in this bathroom for five and one-half hours, waiting for this business to close, is as ludicrous as saying that they were beamed there by Martians."

reasonable that a woman would not have to use the facilities for five and one-half hours and that a look at scientific literature reveals the reasonableness of this assertion. She further argues that there were three other people in the store on February 22, 2005, who could have let someone into the bathroom unbeknownst to the defendant and that many people leave their bathroom doors closed in their workplace. The state responds that the defendant is asking us to retry the case on appeal. We agree with the state and, mindful of our standard of review, which requires us to view the evidence in the light most favorable to sustaining the jury's verdict; see *State* v. *Ledbetter*, supra, 275 Conn. 542; we conclude that the evidence was sufficient to sustain the defendant's conviction.[3]

The evidence reasonably reveals that there were four people who entered the secure area of the store on February 22, 2005: the defendant, the Pierces and Escalera. When the defendant left for her appointment, Escalera covered for her, and he did not let anyone else into

[3] Citing cases from the United States Courts of Appeal for the fifth, eighth and eleventh circuits, the defendant also argues that "[c]ourts of appeal consider the countervailing evidence as well as the evidence that supports the verdict in assessing the sufficiency of the evidence" and that "[t]he evidence equally or nearly equally contradicts the state's theory that [the] defendant would necessarily have known if someone was hiding in the bathroom that day."

We disagree with the defendant's assertion as to our standard of review. Our Supreme Court has been very clear concerning the standard to be employed in assessing a sufficiency of the evidence claim on appeal. We first begin by construing the evidence in the light most favorable to sustaining the jury's verdict. *State* v. *King*, 289 Conn. 496, 520, 958 A.2d 731 (2008); *State* v. *Davis*, 283 Conn. 280, 329, 929 A.2d 278 (2007); *State* v. *Ledbetter*, supra, 275 Conn. 542; *State* v. *Morgan*, 274 Conn. 790, 799, 877 A.2d 739 (2005). Should the defendant believe that this standard is improper, her redress is with our Supreme Court, as we are bound by the precedent it sets. See *West Hartford* v. *Murtha Cullina, LLP*, 85 Conn. App. 15, 24, 857 A.2d 354 ("It is axiomatic that . . . this court [is] without authority to overrule the decisions of our Supreme Court. In the absence of direction by our Supreme Court, inferior courts must continue to adhere to its decisions."), cert. denied, 272 Conn. 907, 863 A.2d 700 (2004).

the secure area. After Escalera and the Pierces left the store, the defendant was the only person in the store with the ability to let anyone into the secure area. Christopher Pierce testified that he may have returned to the store later in the day to bring $1 bills, but he was not certain. The defendant spoke with Breton twice during the day in question, including once shortly before she left work, despite denying to Christopher Pierce that she remained in contact with him. Breton, who had been fired shortly before another Check Stop store had been burglarized, telephoned the defendant while in the New Britain area at 6:01 p.m. At about that same time, the defendant went to the safe, counted and totaled all of the money. The defendant remained at the store until just after 7 p.m., when she set the alarm, which included the motion sensors, and left the store. Just after 7:30 p.m., the safe alarm was triggered, which meant that someone had been in the safe room area. Then, in close sequence, the alarms for the motion detectors for the rear of the store and the front of the store, as well as the alarms for the mantrap door and the front door, respectively, were triggered. Records showed that the defendant received a call from someone using Breton's Manhattan landline telephone at 7:38 p.m., and that the same telephone was used to call Breton's cellular telephone at 7:58 p.m., and that Breton's cellular telephone was no longer in the New Britain area but was then in the New Haven area.

When the police arrived at the store, there was no evidence of forced entry, and one of the front doors was opened. When notified by Gabrielle Pierce that she needed to return to the store, the defendant stated that she was nearby and would be there in just a few minutes. The defendant quickly returned and, according to the police, did not appear surprised by the burglary. A police investigation revealed that there was no area in the store in which a person could have hidden except

for the bathroom. Further, when the police reenacted the crime, it took fourteen seconds to get from the safe to the front door of the store. When the crime was committed, however, it took only twelve seconds from the time the safe alarm was triggered until the alarm on the front door was triggered, suggesting that the money may have been prepackaged for a quick pickup.

On the basis of this evidence and the inferences reasonably drawn therefrom, we conclude that the jury could have inferred that it was the defendant who knowingly was involved in the plot to take the money from the store and that she permitted someone to remain in the area of the safe after she set the alarm and departed the store on the evening of February 22, 2005.

The judgment is affirmed.

In this opinion the other judges concurred.