******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# IN RE ZAYDEN J.*
## (AC 46639)

Suarez, Westbrook and Bear, Js.

### *Syllabus*

The respondent mother appealed to this court from the judgment of the
trial court terminating her parental rights with respect to her minor
child, Z. The mother had an IQ of 64 and had received assistance from
state agencies, including, but not limited to, daily living services and
financial support, for the majority of her life. She had a history with
the Department of Children and Families dating back to 2015 because
of her ongoing mental health issues. On the day Z was born, a hospital
social worker reported concerns regarding the mother's mental health
to the department, including that she had been diagnosed with bipolar
disorder, attention deficit/hyperactivity disorder, intellectual disability,
autism spectrum disorder, and psychosis, and that, throughout the moth-
er's pregnancy, she had been seen at various hospitals for treatment or
intervention due to her unstable mental health and suicidal ideations.
After Z had been adjudicated neglected, the court ordered specific steps
to facilitate the return of Z to the mother and vested the care and custody
of Z in the petitioner, the Commissioner of Children and Families. The
petitioner thereafter filed a petition for termination of the mother's
parental rights with respect to Z. Three days prior to the start of trial
on the petition, the mother filed a motion for a sixty day continuance,
stating that a putative father for Z had been identified and that he was
scheduled to take a DNA test. The court denied the mother's motion
for a continuance and moved forward with the trial. In its memorandum
of decision terminating the parental rights of the mother as to Z, the
court found by clear and convincing evidence that the department had
made reasonable efforts to reunify the mother with Z and that the mother
was unwilling or unable to progress toward reunification. The court
found that, although the department had offered the mother mental
health and medication management services, offered her in-home ser-
vices to assist with her daily living skills, and made arrangements to
ensure that the mother had visitation with Z, the mother consistently
refused the mental health services, did not consistently engage in her
individual therapy, stopped taking needed medication, and revoked all
releases for the department to communicate directly with her providers.

---

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the court.

The court further found that, although the mother participated routinely with her allotted visitation, she was not able to progress in her parenting skills. In the portion of the memorandum of decision addressing the seven mandatory factors articulated in the statute (§ 17a-112 (k)) governing the termination of parental rights, the court emphasized that the mother never consistently engaged in therapy and medication management, thus making limited, if any, progress toward stabilizing her mental health; that the mother could not regulate her own conduct and focus on Z's well-being during visitation sessions; and that she routinely disrupted visitations by being rude to the staff and requiring emergency personnel intervention. In addition, the court found that there was limited evidence as to Z's ties with the mother, that he had been in the care of his foster parents since birth, and that he was bonded to his foster family. The court ultimately found that it was in Z's best interest to terminate the mother's parental rights. *Held*:

1. The respondent mother could not prevail on her claim that the trial court erroneously determined that the department made reasonable efforts to reunify her with Z, this court having found that her claim was moot; although the trial court found by clear and convincing evidence both that the department made reasonable efforts to reunify the mother with Z and that she was unwilling or unable to progress toward rehabilitation, the mother failed to challenge on appeal the court's finding that she was unwilling or unable to progress toward rehabilitation, and, therefore, even if this court were to agree with her claim, it could not provide her with any relief because there was a second independent basis for upholding the court's determination.

2. The trial court's conclusion that the termination of the respondent mother's parental rights was in Z's best interest was not clearly erroneous: although there was evidence in the record that the mother loved Z and attended many of her supervised visits with him, this court has recognized that love and a biological bond is not enough to avoid the termination of parental rights; moreover, there was evidence that when the mother attended her supervised visits with Z, she was often unable to control her behavior during these visits, which raised serious concerns for Z's safety, these facts, in addition to the court's other findings in its memorandum of decision, were grounded in the evidence and strongly supported the court's best interest determination, and this court would not substitute its judgment for that of the trial court.

3. The respondent mother could not prevail on her claim that the trial court improperly denied her motion for a continuance: although the mother asserted that the trial court's denial of her motion deprived her of her constitutional due process right to a fair trial, this court's careful review of the grounds stated in support of the mother's motion for a continuance revealed that they related to the putative father's potential parental rights as to Z and that they did not interfere with the parental rights of the mother or her ability to effectively challenge the allegations in the

petition for termination of her parental rights; moreover, the mother's written motion and her arguments before this court failed to demonstrate that, even if the putative father's rights were adversely affected by the court's denial of the motion for a continuance, the adverse ruling somehow affected fundamental rights personal to her, and, therefore, her claim was not of constitutional magnitude; furthermore, for the same reasons that her claim was not of constitutional magnitude, her claim failed under the abuse of discretion standard of review, under which it was appropriate for this court to review the claim.

Argued January 25—officially released April 18, 2024**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Fairfield, Juvenile Matters, where the court, *McLaughlin, J.*, denied the respondent mother's motion for a continuance; thereafter, the case was tried to the court, *McLaughlin, J.*; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Appeal dismissed in part*; *affirmed.*

*David B. Rozwaski*, assigned counsel, for the appellant (respondent mother).

*Alma Rose Nunley*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Nisa Khan*, assistant attorney general, for the appellee (petitioner).

*Opinion*

SUAREZ, J. The respondent mother, Tabitha M., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights as to her

---

** April 18, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

biological son, Zayden J. (Zayden).[1] On appeal, the respondent claims that the court erred in (1) determining that reasonable efforts were made to reunify her with Zayden, [2] (2) concluding that it was in the best interest of Zayden to terminate her parental rights, and (3) denying her motion for a continuance. We conclude that the appeal is moot as to the first claim and dismiss that portion of the appeal. With respect to the remaining claims in the appeal, we affirm the judgment of the court.

The following facts, as found by the court, and procedural history are relevant to our resolution of this appeal. "The [respondent] was born . . . in June of 1989. She is now thirty-three years old. . . . She has an IQ of 64 and has received assistance, including, but not limited to, daily living services and financial support, from the Department of Developmental Services

[1] We note that the court also terminated the parental rights of John Doe in the underlying proceeding because, at the time of trial, the identity of Zayden's biological father was unknown. Following trial, Lee Roy B. came forward as a putative father and submitted to a DNA test that confirmed he was the biological father of Zayden. On March 30, 2023, the petitioner moved to cite in and amend the neglect petition to include Lee Roy B., which the court granted. The parental rights of Lee Roy B. were not terminated in the underlying proceeding, and he is not a party to this appeal. Accordingly, all references in this opinion to the respondent are to Tabitha M. only.

[2] We note that the respondent labeled her first claim as "[t]he trial court erred in its findings that the respondent had failed to rehabilitate." The respondent specifically argues in her first claim, however, that "the petitioner did not do everything reasonable in this case to effectuate reunification" and that "the petitioner failed to properly engage the respondent in meaningful services." The respondent concludes her first claim by asserting that "the trial court erred in finding that the respondent . . . failed to rehabilitate because the trial court did not take into consideration that [she] required much more intensive services to help her address her mental health issues . . . ." After a careful review of the respondent's appellate brief, we consider the substance of her argument in her first claim to be challenging the court's finding that reasonable efforts were made to reunify the respondent with Zayden. See *In re Aurora H.*, 222 Conn. App. 307, 326 n.10, 304 A.3d 875 ("[i]n our consideration of claims raised on appeal, this court is customarily mindful to evaluate their substance rather than to be bound by imprecise form"), cert. denied, 348 Conn. 931, 306 A.3d 1 (2023).

(DDS) for the majority of her life. [The respondent's] grandmother primarily raised her due to [her] mother's unstable mental health and her father's numerous incarcerations.

"[The respondent] has a history with [the Department of Children and Families (department)] dating back to 2015 because of her ongoing mental health issues. In 2016, the court adjudicated the [respondent's] oldest son, Tyshawn, neglected. At first, the court ordered joint guardianship of Tyshawn with the [respondent] and the maternal grandaunt; however, in 2018, after several negative incidents between the [respondent] and the grandaunt and the continuation of intimate partner violence between the [respondent] and her partners,[3] the [respondent] lost custody of Tyshawn. Tyshawn remains in the sole care and custody of the maternal grandaunt." (Footnote in original.)

Zayden was born in October, 2020. "[The day Zayden was born], a hospital social worker reported concerns regarding the [respondent's] mental health to [the department]. The hospital social worker told [the department] that the [respondent] was diagnosed with bipolar disorder, [attention deficit/hyperactivity disorder], intellectual disability, [autism spectrum disorder], and psychosis. The social worker went on to explain that throughout the [respondent's] pregnancy, [she] had been seen at various hospitals . . . for treatment or intervention due to her unstable mental health and suicidal ideations. . . . The hospital social worker notified [the department] that it would not be in [Zayden's]

_____

[3] "The [respondent] has a history of intimate partner violence . . . with several past partners. In 2018, [the department] received a report that the [respondent's] then partner . . . struck the [respondent] several times with a coat hanger while [she] was unclothed. A woman who was present during the assault recorded the incident and showed the video to [the department]. The woman also uploaded the video of the incident to a social media platform. In addition, the [respondent] reported to [the department] that she suffers from migraines as a result of the physical abuse she endured at the hands of her older child's father . . . ."

best interest to be returned to [the respondent's] care because of her unstable mental health and inability to make rational decisions."

"In October, 2020, the [respondent] was residing at [a residential treatment program for individuals with both mental health and substance abuse disorders (program)]. This residence was part of a court order associated with a criminal case.[4] . . . In November, 2020, the [respondent] left [the program] against medical advice and court orders. The [respondent] failed to complete the program prior to leaving." (Footnote in original.)

On October 30, 2020, the petitioner filed a neglect petition and an order of temporary custody (OTC) with respect to Zayden. The court, *Wilkerson Brillant, J.*, granted the OTC ex parte and ordered preliminary specific steps to facilitate the return of Zayden to the respondent. On November 6, 2020, the court sustained the OTC, reconfirmed the specific steps, and vested the care and custody of Zayden in the petitioner.

"In 2021, the [respondent] was brought to hospital emergency rooms on several occasions for observation or assessment due to her suicidal ideations or depression, including on March 22 and 24, April 5, May 15, August 3 and 4, September 27 and 28, and October 10. The [respondent] also had intervention from emergency personnel, not always leading to transport to the hospital, for suicidal ideations on June 13 and 14, August 3 and 31, September 17 and 28, and October 10 and 19."

---

[4] "The [respondent] has a criminal history from 2017 until 2020. Charges include assault in the third degree, breach of the peace, violation of protective orders, and violation of probation. In August, 2020, she was incarcerated for a violation of probation. The [respondent's] residence at [the program] was a condition of her probation. She was ordered to stay at [the program] until January, 2021. When the [respondent] left the program early, the court issued an arrest warrant for [her] for failure to appear and a violation of probation. The court eventually vacated the warrant, and the [respondent] remained on probation."

On February 24, 2022, the petitioner filed a termination of parental rights petition with respect to Zayden. On March 17, 2022, the respondent filed a motion for a transfer of guardianship to Zayden's cousin, T. The court thereafter consolidated the trial on the respondent's motion to transfer guardianship and the petition to terminate parental rights.

"On May 25, 2022, the court, *Maronich, J.*, adjudicated [Zayden] neglected, based on the [respondent's] nolo contendere plea, and committed [him] to [the petitioner's] care and custody. The court also ordered final [specific] steps for the [respondent]. These [specific] steps were similar in sum and substance to the preliminary [specific] steps that the court ordered at the OTC proceeding in October, 2020. At the adjudication hearing, the court canvassed the [respondent] on her decision to file a written nolo contendere plea, on the disposition of commitment, and on the specific steps." On July 12, 2022, the court, *Reid, J.*, approved a permanency plan of termination of the respondent's parental rights as to Zayden.

On February 6, 2023, three days prior to the start of the consolidated trial on the petition to terminate the respondent's parental rights and the motion to transfer guardianship, the respondent filed a motion for a sixty day continuance, stating that a putative father for Zayden had been identified and that he was scheduled to take a DNA test. The court, *McLaughlin, J.*, denied the respondent's motion for a continuance. The court then held the consolidated trial on February 9 and 16, 2023. The court heard testimony from multiple witnesses, including the respondent, and several exhibits were admitted into evidence.

On April 28, 2023, the court issued a memorandum of decision terminating the parental rights of the respondent as to Zayden and denying her motion to transfer

guardianship.[5] In its memorandum of decision, the court found by clear and convincing evidence that "[the department] made reasonable efforts to locate the [respondent]" and that "[the department] made reasonable efforts to reunify the [respondent] and [Zayden]. Further, the [respondent] proved unwilling or unable to progress toward reunification." The court reasoned that, "[a]t every turn, [the department] offered the [respondent] mental health and medication management services. DDS also offered the [respondent] in-home services to assist with her daily living skills. [The department] made arrangements to ensure that the [respondent] had visitation with [Zayden]. The [respondent] consistently refused and hindered her mental health services. She did not consistently engage in her individual therapy and stopped taking needed medication. The [respondent] revoked all releases for [the department] to communicate directly with her providers. Although the [respondent] did participate routinely with her allotted visitation, she was not able to progress in her parenting skills. [The department] made reasonable efforts to reunify the [respondent] with [Zayden]. Despite these reasonable efforts, the [respondent] was unwilling or unable to make sound progress toward mental health stability and competent parenting." The court further found by clear and convincing evidence after consideration of the seven mandatory factors articulated in General Statutes § 17a-112 (k) that it was in Zayden's best interest to terminate the respondent's parental rights and that a transfer of guardianship was not in his best interest. This appeal followed. Additional facts and procedural history will be provided as necessary.

---

[5] The court also terminated John Doe's parental rights as to Zayden; however, the court did not appoint the petitioner as Zayden's statutory parent because of the pending paternity test for the newly disclosed putative father. The respondent did not appeal the court's denial of the motion to transfer guardianship.

Before turning to the respondent's claims, we first set forth the legal principles that govern our review. "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re A'vion A.*, 217 Conn. App. 330, 336–37, 288 A.3d 231 (2023). "If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Internal quotation marks omitted.) *In re Autumn O.*, 218 Conn. App. 424, 431, 292 A.3d 66, cert. denied, 346 Conn. 1025, 294 A.3d 1026 (2023).

I

The respondent first claims that the court erred in determining that the department made reasonable efforts to reunify her with Zayden. Specifically, she argues that "the [department] did not offer nor provide

meaningful services to the respondent which would have enabled her to better understand [Zayden's] needs and be able to address and meet those needs of [Zayden]. While there were some existing services in place already, not enough was done to determine if the services were useful and beneficial to the respondent in helping her address her mental health issues." The respondent further asserts that "the trial court did not take into consideration that [she] required much more intensive services to help her address her mental health issues . . . ." We conclude that the respondent's appeal is moot with respect to this claim.

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction . . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. . . . A case is considered moot if [the] court cannot grant the appellant any practical relief through its disposition of the merits . . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way. . . . Our review of the question of mootness is plenary. . . .

"Section 17a-112 (j) (1) provides in relevant part that the Superior Court may grant a petition [for termination of parental rights] if it finds by clear and convincing evidence that . . . the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent . . . *unless* the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts . . . . In construing that statutory language, our Supreme Court has explained that, [b]ecause the two clauses are separated by the word unless, this statute plainly is written in the conjunctive. Accordingly, the [petitioner] must prove *either* that it has made reasonable efforts to reunify *or*, *alternatively*, that the

parent is unwilling or unable to benefit from reunification efforts. . . . [E]ither showing is sufficient to satisfy this statutory element. . . .

"Because either finding, standing alone, provides an independent basis for satisfying § 17a-112 (j) (1) . . . in cases in which the trial court concludes that *both* findings have been proven, a respondent on appeal must demonstrate that both determinations are improper. If the respondent fails to challenge either one of those independent alternative bases . . . the trial court's ultimate determination that the requirements of § 17a-112 (j) (1) were satisfied remains unchallenged and intact. . . . In such instances, the appeal is moot, as resolution of a respondent's claim of error in her favor could not [afford] her any practical relief." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re A'vion A.*, supra, 217 Conn. App. 354–55.

In the present case, the court found by clear and convincing evidence that the department made reasonable efforts to locate the respondent and to reunify her with Zayden and that she was unwilling or unable to progress toward rehabilitation. In her appellate brief, the respondent challenges only one of the two separate and independent bases for upholding the court's determination that the requirements of § 17a-112 (j) (1) had been satisfied. Specifically, the respondent does not challenge the court's finding that she was unwilling or unable to progress toward rehabilitation. See footnote 2 of this opinion. Therefore, even if we were to agree with her claim that the department did not make reasonable efforts to address her mental health issues in order to reunify her with Zayden, we could not provide her with any relief in connection with this claim because there is a second independent basis for upholding the court's determination, which she does not challenge. See *In re Natalia M.*, 190 Conn. App. 583, 588, 210 A.3d

682, cert. denied, 332 Conn. 912, 211 A.3d 71 (2019). Accordingly, we dismiss this claim as moot.

II

The respondent also claims that the court erred in concluding that it was in Zayden's best interest to grant the petition for termination of her parental rights. Specifically, the respondent argues that "[she] clearly loves her son and she has brought food and clothing for him to the visits, she has, in her own way, tried to teach him his ABCs and 123s, and she has tried to help him maintain a relationship with his older brother and other extended family members who could not attend the visits that the respondent had with Zayden." The respondent also contends that she has "offered other family members and the putative father as resources for Zayden while she works on her mental health issues." The petitioner argues that there was ample evidence to support the court's best interest determination.[6] We agree with the petitioner.

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [respondent's] parental rights is not

[6] We note that the attorney for Zayden filed a letter with this court adopting the brief of the petitioner.

in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven statutory factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence. . . .

"It is axiomatic that a trial court's factual findings are accorded great deference. Accordingly, an appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *In re Anthony S.*, 218 Conn. App. 127, 152–53, 290 A.3d 901 (2023).

In its memorandum of decision, the court considered and made findings under each of the seven statutory factors in § 17a-112 (k) before determining, by clear and convincing evidence, that it was in Zayden's best interest to terminate the respondent's parental rights. In the dispositional portion of its memorandum of decision, the court emphasized that the respondent "never

consistently engaged in therapy and medication management, thus making limited, if any, progress toward stabilizing her mental health. . . . Further, while the [respondent] always attended her visitation sessions with Zayden, she did not gain any insight into her parenting. The [respondent] never understood portion control for [Zayden] and never was able to properly soothe [him]. The [respondent] could not regulate her own conduct and focus on [Zayden's] well-being. Moreover, the [respondent] routinely disrupted visitations in that she was rude to the staff and required emergency personnel intervention."

In addition, the court found that "[t]here was limited evidence as to [Zayden's] ties with the [respondent]. . . . [Zayden] has been in the care of his foster parents since birth. He is now two. All he has known are his current foster parents. The foster family cares for Zayden and ensures his health, education, and every need are tended to. He is bonded to this family." Furthermore, the court credited the testimony of the respondent's case manager at the department, Sherene Williams, who supervised some of the respondent's visits with Zayden. Specifically, Williams testified at trial that the department assessed each of the six relative resources identified by the respondent and determined that they were not appropriate for placement for various reasons: T became ill and stated that she could not be a resource at this time; one was not able to pass the department's checks; one had an active department case against her; one told the department that she did not want to be a resource for Zayden; and two were not employed at the time and only wanted guardianship of Zayden instead of being a foster parent to him.

The court's finding that the termination of the respondent's parental rights is in Zayden's best interest is supported by the evidence in the record. Although there is evidence in the record that the respondent loves

Zayden and attended many of her supervised visits with him, this court has recognized that "love and a biological bond is not enough." *In re Emily S.*, 210 Conn. App. 581, 628, 270 A.3d 797, cert. denied, 342 Conn. 911, 271 A.3d 1039 (2022). Moreover, there was evidence that when the respondent attended her supervised visits with Zayden, she was often unable to control her behavior during these visits, which raised serious concerns for Zayden's safety. For example, Williams testified that the police had to be called three times during the respondent's supervised visits at the department. Two of those instances were because the respondent refused to relinquish Zayden to department personnel at the conclusion of her visits.[7] Williams also testified that Zayden has lived with his foster parents since birth, has developed a strong bond with them, and refers to them as mom and dad. Furthermore, the court credited Williams' testimony that the department evaluated each of the relative resources provided by the respondent and deemed each of them inappropriate as a relative placement resource for Zayden. It is well established that "we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . In a case that is tried to the court . . . the judge is the sole arbiter of the credibility of witnesses, and the weight to be given to their specific testimony." (Internal quotation marks omitted.) *In re Christina C.*, 221 Conn. App. 185, 221, 300 A.3d 1188, cert. denied, 348 Conn. 907, 301 A.3d 1056 (2023).

These facts, which are grounded in the evidence, strongly support the court's best interest determination,

---

[7] Williams also testified that, during the last supervised visit where the police had to be called, the respondent threatened to jump out of a fourth floor window when Zayden was out of her hands. After this incident, the department moved the supervised visits to a third-party provider due to safety concerns.

and we will not substitute our judgment for that of the trial court. Accordingly, we conclude that the court's conclusion that the termination of the respondent's parental rights is in Zayden's best interest was not clearly erroneous.

### III

Finally, the respondent claims that the court improperly denied her motion for a continuance. She asserts that the denial of her motion violated her fundamental "right of family integrity." We disagree.

As set forth previously in this opinion, on February 6, 2023, three days prior to the scheduled beginning of the consolidated trial on the petition to terminate the respondent's parental rights and the respondent's motion to transfer guardianship, the respondent filed a motion for a sixty day continuance, stating that a putative father for Zayden had been identified and that he was scheduled to take a DNA test. As grounds for her motion, the respondent asserted that "[a putative] father, [Lee Roy B.], has been identified and a DNA test [has been] scheduled. The DNA test has been delayed. [The putative] father needs to be given reasonable efforts. In addition, several relatives have been identified for a [transfer of guardianship] but [the department] has refused all relatives." The court denied the respondent's motion for a continuance. The court then held a trial on February 9 and 16, 2023.

In raising a challenge of constitutional dimension with respect to the court's denial of the motion for a continuance, the respondent asserts a deprivation of her due process right to a fair trial. The petitioner argues that we should not review the respondent's constitutional claim and, in the alternative, argues that the trial court properly exercised its discretion in denying the respondent's motion for a continuance.

It is necessary to consider whether to review the respondent's claim as a claim of constitutional dimension, as the respondent argues, or whether we should review the court's ruling for an abuse of its discretion, as the petitioner argues. "The due process rights of the fourteenth amendment to the United States constitution apply in proceedings brought by the state to terminate parental rights. . . . A reviewing court ordinarily analyzes a denial of a continuance in terms of whether the court has abused its discretion. . . . This is so where the denial is not directly linked to a specific constitutional right. . . . If, however, the denial of a continuance is directly linked to the deprivation of a specific constitutional right, some courts analyze the denial in terms of whether there has been a denial of due process. . . . Even if the denial of a motion for a continuance on the ground of lack of due process can be directly linked to a claim of a denial of a specific constitutional right, *if the reasons given for the continuance do not support any interference with the specific constitutional right*, the court's analysis will revolve around whether the trial court abused its discretion. . . . In other words, the constitutional right alleged to have been violated must be shown, not merely alleged." (Citations omitted; emphasis added; footnote omitted.) *In re Shaquanna M.*, 61 Conn. App. 592, 601–603, 767 A.2d 155 (2001).

Our careful review of the grounds stated in support of the respondent's motion for a continuance reveals that they relate to the putative father's potential parental rights as to Zayden. The reasons stated in the motion for a continuance do not interfere with the parental rights of the respondent, her ability to effectively challenge the allegations in the termination of parental rights petition, or her ability to pursue her motion to transfer guardianship. Specifically, the motion relates to Lee Roy B.'s right to have the department make

reasonable efforts to reunify him with Zayden, if he was found to be the biological father. In neither the respondent's written motion nor her arguments before this court does the respondent demonstrate how the grounds of the motion implicated the adjudication of her parental rights. "[I]t bears emphasis that termination of parental rights proceedings concern *only* the rights of the *respondent parent*." (Emphasis in original; internal quotation marks omitted.) *In re Deboras S.*, 220 Conn. App. 1, 39, 296 A.3d 842 (2023). Lee Roy B. was not a party to the underlying termination proceeding and the respondent is unable to demonstrate that, even if his rights were adversely affected by the court's denial of the motion for a continuance, the adverse ruling somehow affected fundamental rights personal to her. The respondent's claim is not of constitutional magnitude, and thus it is proper to analyze the claim under the abuse of discretion standard of review.

"The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . [Our Supreme Court has] articulated a number of factors that appropriately may enter into an appellate court's review of a trial court's exercise of its discretion in denying a motion for a continuance. Although resistant to precise cataloguing, such factors revolve around the circumstances before the trial court at the time it rendered its decision, including: the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on

the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; [and] the [party's] personal responsibility for the timing of the request . . . ." *In re Na-Ki J.*, 222 Conn. App. 1, 15–16, 303 A.3d 1206, cert. denied, 348 Conn. 929, 304 A.3d 860 (2023).

Having determined that the respondent's claim is not of constitutional magnitude, and is therefore reviewed under an abuse of discretion standard, we conclude that she has failed to show how the court abused its discretion in denying her motion for a continuance given her failure to demonstrate how the grounds of the motion implicated the adjudication of her parental rights.

The appeal is dismissed with respect to the respondent's claim that the department did not make reasonable efforts to reunify her with Zayden; the judgment is affirmed.

In this opinion the other judges concurred.